# Meinaka *v.* The State.

*Indictment for Murder.*

1. *Admissibility of confessions.*—Confessions, made by the prisoner while in custody, cannot be rejected, as having been obtained by improper inducements, when it is only shown that he was importuned to confess if guilty, and not to confess if innocent.

2. *Preliminary proof to court, in reference to confessions.*—Although it is necessary, before a confession is allowed to go to the jury, to make preliminary proof to the court that it was not obtained by any improper inducements held out to the prisoner ; yet, in this case, the objection to the testimony being general, and the record tending to show that the witness was speaking of the same confessions to which others had testified, and as to which the requisite preliminary proof had been made to the court, *held*, that the record did not show error in this respect.

3. *Casual remarks of presiding judge to counsel, not revisable as rulings or charges to jury.*—A casual remark made by the presiding judge to counsel, pending the discussion of a legal question as to the admissibility of evidence, though made in the hearing of the jury, is not revisable on error as a ruling or charge, when the record shows that it was not intended for the jury, and it does not appear to have influenced their verdict.

FROM the Circuit Court of Russell.

Tried before the Hon. JAMES E. COBB.

The prisoner in this case, Charles Meinaka, was indicted for the murder of Albertus R. Lyon, by shooting him with a gun; pleaded not guilty to the indictment; was convicted of murder in the first degree, and sentenced to imprisonment for life in the penitentiary. The deceased was about sixty years old, and was killed on the night of 11th November, 1876, in the yard of his own residence, near Crawford in said county, while going from the house to the well for a bucket of water. On the trial, the prisoner reserved several exceptions to the rulings of the court, of which it is only necessary to state the following:

"The State introduced Dr. *John M. Thomas* as a witness, who testified, that on or about the 11th November, 1876, he was called on, as a practicing physician, to examine the body of the deceased, and found him lying near the well, on a back porch of the house, with an extinguished torch lying near by; that the wounds on the neck indicated the entrance on the right side of some large missile, fired from a gun, which passed directly through the collar-bone, severing the vertebræ, and coming out on the left side ; that a large slug, or piece of iron, about as large as the first joint of a man's little finger, with the ends flattened towards each other, as if

they had been beaten with a hammer, was found in the clothing of the deceased, resting near the left side of the neck; that the wound was evidently made by that instrument, fired from a gun, and it produced the death of the deceased; and that a cut on the head, apparently caused by striking a corner in falling, was the only other wound on the body. Witness said, that he was in Crawford a few days afterwards, and there saw the prisoner under arrest, and conversed with him some time during the day; and that others were with the prisoner when he first saw him. Having stated that no promises, inducements, or threats, were made by him, or by any one else in his presence, witness was then asked to state the prisoner's confessions, as made to him in that conversation; to which the prisoner having objected, the court directed the witness to stand aside.

" The State then introduced *Charles O'Brien* as a witness, who testified, that on the morning after the prisoner was brought into Crawford, very early, he went to the old hotel, where the prisoner was kept under guard, to see him, and found J. M. Fuller and another man guarding him; that about five minutes after he had come in, Fuller and the other guard asked him to remain there with the prisoner, and went away; that this was the first time he had ever seen the prisoner; that he (witness) asked the prisoner, ' if he was the man that killed old man Lyon;' that the prisoner replied, ' No, he was not the man that did it,' and then drew his chair close up to witness, and said, ' I want to tell you something.' Witness said, that he made no promises, nor threats, nor offered any inducements ; and he was then asked to state the prisoner's confessions, as made to him at that time ; to which the prisoner having objected, the court caused the witness to stand aside.

" The State then introduced *J. M. Fuller* as a witness, who testified, that the citizens of Crawford held a meeting after the death of said Lyon, and appointed witness and Ben Edge to go to Opelika, procure the arrest of the prisoner, and bring him back to Crawford; that he and Edge went to Opelika, and, on his own affidavit, procured a warrant for the prisoner, upon which he was arrested, and turned over to them, with J. D. B. Hooper, to be carried to Crawford, which was about twenty miles distant ; that the prisoner was handcuffed, and placed in a buggy with said Hooper, who rode in the buggy with him the most of the way to Crawford, while witness and Edge rode along with them on horseback; that witness took Hooper's place a part of the way, and rode in the buggy; that he used no threats or promises to the prisoner, and no other person did in his presence, though

much might have been said between Hooper and the prisoner, while riding together in the buggy, which witness did not hear; that they arrived in Crawford about ten o'clock at night, and carried the prisoner to a grocery, and thence to the old hotel, where he was kept under guard; that when the prisoner laid down that night, he told witness that he would tell him something in the morning; that he, witness, with Hooper and others, remained in the room with the prisoner all night; that the next morning, when Charles O'Brien came into the room, witness and Stafford Gibson were guarding the prisoner, and they went out, and left O'Brien and the prisoner together.

"The court then called said *J. D. B. Hooper* to the stand, who testified, that he resided in Opelika when the prisoner was arrested, and was a notary-public there; that the prisoner also resided there, and knew him; that he rode in the buggy with the prisoner the most of the way from Crawford to Opelika, and Fuller and Edge rode behind on horseback, as guards over the prisoner, who was handcuffed. Witness said, that during the first ten miles of the trip he tried to get the prisoner to tell what he knew about the killing of Lyon, if anything—told him that it was a grave and serious charge he was arrested on, and called his attention to his helpless and friendless condition; told him, if he was not guilty, under no circumstances to say so, since, however suspicious the circumstances may appear, truth will prevail in the end; but, if he was guilty, and would confess it, witness had no doubt the court and the country would be inclined to be merciful to him, as it was supposed others were implicated, who, witness had no doubt, were more guilty than he, and it was not right that he should be made the scapegoat for the crimes of others, while they went free: that they were after others, more than they were after him; that the penalty was hanging, or imprisonment for life; that if he was guilty, his confession would tend to secure to him the milder punishment; that he had better confess it, if he was guilty, especially as doing so might secure to him the milder punishment; that he (witness) thought everybody would be more favorably inclined towards him, if he showed a penitent spirit for the great wrong he had committed, if he was guilty; and that such would be his own feeling towards him. Witness further testified, that he used every means in his power, by closely questioning the prisoner, to ascertain what, if any thing, he knew about the killing; could not recollect all he did say, and scarcely any of the exact words he used; talked with him a great deal, and might have stated to the prisoner's counsel, in private conversation, 'that he gave him the

best in his shop to get him to tell,' meaning thereby that he endeavored, by questioning the prisoner closely, to ascertain what he knew, if anything, about the killing; that he might have said something to him about turning 'State's evidence;' that his effort was to induce the prisoner to believe that, if he would tell the truth, and confess if guilty, it would be lighter on him; that while he could not remember the *many* (?) words used, he had no doubt that he had made the impression on the prisoner's mind that it would be lighter on him if he told the truth; also, that the prisoner did not confess to him; that he, and all other persons in his presence, treated the prisoner with uniform kindness, and did not threaten him in the least; that he, as a lawyer, knew that if the prisoner had confessed to him at that time, after what he had said, the confession could not be used against him. Witness further said, that when they got within about six miles of Crawford, they were met by a party of men who had come out to meet them, and who accompanied them back to Crawford; that when they arrived in Crawford, the prisoner was carried into a bar-room, or grocery, where all except witness took drinks, the prisoner taking a little whiskey with bitters in it; that he told the prisoner repeatedly during the ride, if he was not guilty, under no circumstances to confess; that after he had given up all expectation of getting anything out of the prisoner, his last remark to him, before dropping the subject of the killing, was the caution, that he ought under no circumstances to confess, if he was not guilty—that the truth would prevail in the end, and that he need not fear any mob violence; that the prisoner was then removed to the old hotel, and, before going, remarked to witness, in reply to some question,'I care not to talk to-night'; that the prisoner did not seem to want to talk to witness at all; that he, witness, with Fuller and others, remained in the room all night with the prisoner, and that his handcuffs were kept on him all that time.

"The State then recalled the witness *O'Brien*, and asked him to state what, if anything, defendant said to him; to which the defendant objected, on the ground that no sufficient predicate had been laid for introducing confessions; which objection the court overruled, and the defendant excepted. The witness then testified, that the prisoner told him, on the occasion heretofore mentioned by witness, ' that he was the one who shot old man Lyon.' The prisoner objected to the introduction of this confession, the same not having been shown to have been voluntary; but the court overruled the objection, and allowed the witness to proceed with the confessions; to which the prisoner excepted. Wit-

ness, resuming, said, that he replied to the prisoner, 'If you are, you are a fool to confess it;' that defendant then told witness, that Mrs. Lyon hired him to kill her husband, promising to give him five hundred dollars and a set of bedroom furniture, if he would do it; that she gave him a note to carry to Mrs. Davis, her mother, which he carried from Opelika on Friday, and got to the house of old man Davis about dark; that he went up to the window of the diningroom, and tapped on it, when Mrs. Davis came to the window, and received the note, and then handed him a gun; that he loaded the gun, and went around near the well, and stood behind a tree; that old man Lyon came to the well to draw water; that he raised the gun, but his hand trembled, and he threw it down; that old man Lyon went back to the house, and, when he had gone to bed, he (the prisoner) went to the window, and tapped again; that Mrs. Davis came to the window, and patted him on the shoulder, and said, 'What is the matter, Charlie;' that he told her, his heart failed him, and he could not kill him; that she then told him, 'You must do the work, and your money is sure to come;' that she then took him into the house, and gave him supper, and afterwards carried him around into a room in which there was some seed cotton, and scratched out a hole in the cotton, and told him to get into it, and covered him up with the cotton, and then got into the bed in the same room, in which old man Davis was asleep at the time; that Mrs. Davis got up soon the next morning, and told him to go to an old house in a field, and remain there during the day; that he went to the house, and Willie Carlisle, who was the son of Mrs. Lyon by a former husband, brought him his breakfast and dinner that day; that he (defendant) came back at night, and took his position near the well; that when old man Lyon came to the well for water, he raised the gun, and fired, and the old man fell; that he then made his way back to Opelika, getting there about 11 o'clock at night, and went to Mrs. Lyon's house; that she asked him if he had done the work, and he replied that he supposed so; that she then called a servant-girl, and told her to get the best supper in that house for him; that the girl cooked his supper, and he ate it, and went to bed. Witness further testified, on cross-examination, that he did say, on yesterday, that if the prisoner was not under arrest, and repeated what he then said to him (witness), he would burst him (prisoner) open; that he said this, because the prisoner, while in the charge of officers, passing from the court-house to the jail, met witness at the gate, and asked him for 'that five dollars he owed him.' The counsel for the State objected to this testimony, but the court allowed it to

go to the jury, as tending to show the *animus* of the witness. The State's counsel then asked the witness, what were his reasons for being offended at what the prisoner said to him; to which question the prisoner objected, and excepted to its allowance by the court. The witness, answering, said, that he had heard the prisoner had said that the citizens of Crawford had all agreed to pay him five dollars each to make the confession; and that when the prisoner asked him the question yesterday, it mortified him very much, and hence his remark under the impulse of the moment; and that he had no feeling against the prisoner.

"The State then recalled *J. M. Fuller*, who testified, that on Friday evening, the day before the Saturday on which Lyon was killed, he met the prisoner in the road near Crawford, about an hour by sun; that on the morning on which the prisoner made the confession to O'Brien, about 10 o'clock, in the same room at the old hotel, the prisoner confessed to him. The witness being then asked to state what these confessions were, the prisoner objected, because the same had not been shown to have been voluntary; but the court overruled the objection, and allowed the witness to testify to the confessions; to which the prisoner excepted. The witness then stated, that the prisoner said to him, on the occasion referred to, that he was the man—that he was the man witness met in the road, and that witness was riding a light horse; and being asked by witness if he meant a gray horse, he said, 'yes.' The prisoner further said, as said witness testified, that he kept the road that evening after meeting witness, until he crossed a creek, when he found that he was lost, and recrossed the creek, taking a road which led him into a lane; he then came to an old field, in which there was high grass, got over into the field, and went on until he came to an old house; then crossed another field of high grass, passed through it, and went down into Mr. Davis's lot, near the house; stayed there a short time, and then went up to the house, and knocked on the window of the dining-room; that Mrs. Davis came, and gave him a gun; that he went down into the field, and loaded the gun with an iron slug and buckshot, and came back, and stood near the house, but his heart failed him, and he did not shoot; that he went to the house, and Mrs. Davis let him in to the fire in the dining-room; that after he got warm, she carried him out the back way, into the hall, and put him into some cotton to sleep; that he remained in the cotton until morning, and, when the rest were done eating, went in and ate his breakfast; that he then went down into the field, to an old house, and remained there all day; that he came back near the house at dark,

and took a position in an open place near the well; that when
Mr. Lyon came out, with a torch in his hand, he raised the
gun, and fired; that he immediately fled, and got back to
Opelika about 12 o'clock that night; that Mrs. Lyon made a
negro girl cook him some supper, and told her to cook him
plenty; that she asked him 'if he had done the work,' and
he replied, 'he reckoned so.' The prisoner told witness, as he
testified, that Mrs. Lyon was to give him five hundred dol-
lars and a set of furniture for a room, to kill said Lyon; that
she had been after him a long time to get him to kill him;
that she once told him to go into a cellar, and get some corn,
and strew it along from the cellar-door, and then stand be-
hind the door, and she would tell Mr. Lyon that robbers
were stealing corn, and send him into the cellar to see about
it, and then he could kill him with an axe; that the slug used
in the gun was taken from a box of old iron in the cellar, and
carried home by old Mrs. Davis, a week or two before the
killing; that on the night of the killing he passed a house
at which there were a good many people, as if there was a
party there; that he met some little negroes beyond Craw-
ford, and inquired the road of them to Salem, and stopped
at a store on the road, and inquired the way to Salem; that
he stopped at another house, after crossing a bridge, and in-
quired the way. Further testifying, witness said, that the
prisoner was a man of foreign birth, and did not speak plain
English; that he frequently spoke broken English, which
witness could not understand at all; that witness frequently
had to ask him two or three times before he could fully un-
derstand him; that he has not given the precise language of
the prisoner's confessions; that he could understand the
prisoner, but could not talk like him; that he asked the
prisoner, during the confessions, to repeat over certain words,
and, at times, if he meant to say certain words; that during
the morning, after this confession, the prisoner had two at-
tacks of something that looked like fits, during which he fell
down, and frothed a little at the mouth, his limbs became
rigid and drawn, and he gritted his teeth; that these attacks
were short; that he had charge of the prisoner, and suffered
nobody to talk to him about the matter of the confessions
without his permission; that at the preliminary trial, at
Crawford, witness testified about this confession, but did not
tell anything about that part in which the prisoner said that
the slug was taken from a box of old iron in the cellar, and
carried home by Mrs. Davis, nor about the plot to kill
Lyon in the cellar with the axe; that he did not recollect
these particulars at the time of the preliminary trial; that
he had lived near Crawford all his life, and knew the country,

and the route described by the prisoner; that the country, as described by the prisoner, was in all respects as described by him; that there was a party at the house described by him, on the night mentioned; that on Friday night before the murder, at the time and place mentioned by the prisoner, he met a man about the size and general appearance of the prisoner.

"The State then recalled Dr. *J. M. Thomas,* who testified, that the wound on the neck of the deceased indicated that the missile passed in low down on the right side of the neck, through the neck, and out on the left side higher up; that the deceased was a tall man; that he (witness) did not know the height of the porch at the well; that the slug was taken by one Greene, who was on the coroner's jury, and given by him to one Moore, who was then the acting deputy-sheriff of Lee county, and who wanted to take it to Opelika, supposing that he could trace it; that he (witness) was called to see the prisoner the day after he was brought to Crawford, who, they said, had a fit on him, and went immediately where he was, but the fit had passed off when he got there; that he heard the prisoner talking that morning to some of the crowd about the killing. The witness being then asked to state what the prisoner said, the prisoner objected; but the court overruled the objection, and permitted the witness to state the prisoner's confessions; to which the prisoner excepted. The witness then stated, that the prisoner described the gun with which he did the shooting, and said, that it was a brass-mounted gun, and had the stock cut down very small where it came to the face in shooting; and witness said, that he had seen such a gun at Crawford. Witness further testified, that he had never seen the prisoner until the day after he was brought from Opelika to Crawford; that the slug found by him on the body of the deceased was similar to that described to him by the prisoner; that there was a buckshot hole in the hat of the deceased; that witness made no examination of the deceased at any time; that the prisoner was talking to those about him; that he formed no opinion as to the state of the prisoner's mind, but the prisoner impressed him as a man of common sense; and that the effect of epilepsy on the mind is towards *dementia.*

"The State then introduced *Robert Baldwin* as a witness, who testified, that he was placed as a guard over the prisoner the day after he was brought from Opelika to Crawford; that no threats or promises were made to the prisoner by him, or any one else, that he knew of; that he had a talk with the prisoner while guarding him, and the prisoner said——
Here the prisoner objected to any evidence of confessions,

[Meinaka v. The State.]

but the court overruled the objection, and the prisoner ex-
cepted.   The witness then detailed the conversation, about
the same as given by other witnesses."

The above extracts from the bill of exceptions are all that
relate to the prisoner's confessions, though it purports to set
out all the evidence adduced on the trial, and shows nume-
rous exceptions to the rulings of the court which, since this
court does not pass upon them, it is unnecessary to notice.

J. L. Davis, who was the father of Mrs. Lyon, was exam-
ined as a witness for the defense, and stated that, about the
10th October preceding the homicide, while in Opelika selling
cotton, he saw the prisoner, who was there engaged in the
business of a butcher, and wanted to sell him some beeves;
that the prisoner said he was not able to buy them himself,
but could show him a man who could; that the prisoner
came down to his house a few days afterwards, with a rope
and a whip, and wanted to buy a beef, but said that he had
no money to buy one with, and that he (witness) did not sell
him one.   "Witness was then asked by the prisoner's coun-
sel, why he did not sell him a beef; to which question, and
to the prisoner's statement that he wished to buy a beef, the
counsel for the State objected.   The court at first sustained
the objection, but afterwards allowed the witness to answer.
There were several earnest arguments from the defendant's
counsel, to show that the judgement of the court was erro-
neous, and that the evidence was proper to show why the
prisoner was there—that it showed he was there on legiti-
mate business.   During a colloquy between the court and
defendant's counsel, as to the legality of this evidence, the
court, by way of meeting the argument addressed to the
court, remarked to the counsel, in the hearing of the jury,
'If he was a conspirator, and was down there looking around,
nothing would be more natural than for him to say he wanted
to buy a beef.'   To which remark of the court, made in the
hearing of the jury, the prisoner excepted."

The several rulings to which exceptions were reserved on
the trial, are here presented for revision, and urged as error.

W. H. BARNES and H. C. LINDSEY, for the prisoner.

JNO. W. A. SANFORD, Attorney-General, for the State.

STONE, J.—All that we can affirm of the inducements
held out to the prisoner is, that he was importuned to con-
fess if guilty, and not to confess if innocent.   The reasons
offered in the latter category why he should remain firm, and
abstain from confession, were quite as strong and controlling,

as were those offered in the former to induce him to confess. As was said in *Aaron's case*, 37 Ala. 115, "to suppose that the prisoner was influenced by the declaration to make the confession, is to concede his guilt; for, in no other contingency, was he advised to confess. The prisoner, if innocent, was warned not to say he had done the deed, in language equally as strong as that which sought his confession if guilty." The Circuit Court did not err in allowing the prisoner's confessions to be given in evidence against him.

2. The confessions proved by Dr. Thomas are excepted to, on the alleged ground that proof was not made to the court, before evidence of these confessions was received, that no inducements were offered to the prisoner to make them. The record is silent on the question, whether such proof was or was not made in immediate connection therewith. The objection to the testimony is general, specifying no ground. It rests alone on the alleged failure of the record to affirm that such preliminary proof was made. We do not think this exception well taken. It is shown that the presiding judge well understood the rule; for a lengthy examination of witnesses, whose testimony related to this subject, was had before any of the confessions were allowed to go before the jury. If the attention of the court had been specially called to the question, we have no doubt the record would have been made to show affirmatively that such proof was offered.

Another view: This witness did not propose to testify to confessions made specially to him. His language was, he " heard prisoner talking to some of the crowd about the killing." What this witness was asked to testify, was what prisoner said " about the killing," in this conversation. The Circuit Court had the case before it; had heard much proof on the subject of inducements and threats; had previously heard the testimony of J. Munroe Fuller, who testified that, on the day on which the alleged confessions were made, which it was proposed to prove by Dr. Thomas (the day after prisoner was carried to Crawford), he, Fuller, "had charge of the prisoner, and suffered nobody to talk to him about the matter of the confessions, without witness' permission." He also testified that, during the time he had prisoner in charge, he, the prisoner, had two spasms, or epileptic fits. Up to this time, the proof was very full that no inducements which the law can regard had been offered to the prisoner to confess. Dr. Thomas was called to the prisoner when he had the fits; and it was then he "heard the prisoner talking to some of the crowd about the killing." These were the confessions which it was proposed to prove by this witness. The record strongly tends to show, that the confession

[Meinaka v. The State.]

proved by Dr. Thomas was part and parcel of the identical confession previously proved by other witnesses; before the introduction of which, very ample preliminary proof was made to the court, that they were voluntary. We do not feel at liberty to find, on the recitals of this record, that the court received in evidence the confessions of the prisoner proved by Dr. Thomas, without proper preliminary proof that they were voluntarily made. It is our duty to make every reasonable intendment; to indulge every reasonable presumption, in favor of the correct ruling of the Circuit Court, which the record does not affirmatively repel. Error is not presumed, but must be proved by the record.—1 Brick. Dig. 781, §§ 118, 120.

3. Defendant was shown to be a butcher by trade, and, at the time, had his home at Opelika. About a month before the homicide, he had visited Crawford, and the residence, near by, of Lyon, the deceased, taking with him a rope and whip. While there, he wished to purchase a beef of witness, who lived at the same place with deceased; but did not purchase. The prisoner's counsel proposed to prove that prisoner made said visit, carrying the rope and whip, and what he said at the time was the purpose of his visit. The prosecuting counsel objected to the introduction of this evidence, and a discussion grew up on its admissibility. The court was at first inclined to rule it out, but, after the argument, permitted these things to be proved. The bill of exceptions says: "There were several earnest arguments from defendant's counsel, to show that the judgment of the court was erroneous, and that the evidence was proper to show why the prisoner was there—that it showed he was there on legitimate business, etc. During a colloquy between the court and defendant's counsel, as to the legality of this evidence, the court, by way of meeting the argument addressed to the court, remarked to the counsel, in the hearing of the jury, 'If he was a conspirator, and was down there looking around, nothing would be more natural than for him to say he went down to buy a beef.' To which remark of the court, made in the hearing of the jury, the prisoner excepted."

In the case of *Phillips v. Beene*, 16 Ala. 720, an attempt was made to have a review of a remark made by the circuit judge, pending a trial before him, but which did not appear to have been given in charge to the jury. Commenting on it, this court said: "It may have been insisted on by the counsel, as an abstract proposition of law, and the court may have differed with him; but it cannot be seriously contended, that every expression of opinion by the court, during the progress of the trial, if erroneous, shall furnish ground for reversal.

[Meinaka v. The State.]

Such opinion must, in some way, influence the result of the cause, or be supposed to do so, by being given in charge to the jury, or by a refusal to charge, or by being connected with the exclusion or admission of the evidence." In the present case, it is manifest the remark was not intended for the jury. It was made, as one means of testing the admissibility of the evidence. It did not probably influence the jury; and if the prisoner's counsel feared it would, he should have asked the court to inform the jury that they should not be influenced by it. If this request had been made, and the court had refused to so instruct the jury, we will not say this would not have been error. We cannot, however, review every casual remark that may be made by the presiding judge pending the trial—made, probably, by way of illustrating an argument—unless, upon a charge given or refused, such remark is, in effect, made part of the court's instructions to the jury.

In what we have said, we do not wish to be understood as sanctioning any practice, by which the presiding judge may indicate a preference of one party, or his asserted rights, over another, or of the credibility of one witness over another, or by which any right which the law sanctions or guaranties may be disparaged. The duty of the presiding judge is performed, when he declares the law on the questions legitimately presented. The facts, the credibility and weight of the evidence, and its application to the principles of law given in charge by the court, are purely for the jury. An invasion by the court within the domain thus assigned to the jury, equally with an assumption by the jury of the powers of the court, has no sanction in the law. We have indulged in these remarks, to prevent a misapprehension of the principle of our decision, announced above. We find nothing in the present record which tends to show that the circuit judge, in the trial of this cause, invaded the province of the jury.

The other exceptions reserved were not pressed in argument, and we think there is nothing in them.

The judgment of the Circuit Court is affirmed.