# Schieffelin *v.* Schieffelin.

*Contest of Probate of Will.*

1. *Organization of jury; excusing juror within discretion of the court.*—On the trial of a civil case, the excusing of a juror upon the ground that he had a fixed opinion or was prejudiced, is within the discretion of the trial court; and the exercise of such discretion, when not arbitrarily done, but apparently in the interest of justice, will not be reviewed on appeal.
2. *Same; completing venire.*—On the trial of a contest as to the validity of a will, on the organization of a jury, the court may require the entire list of jurors summoned to be exhausted before resorting to talesmen; and where four of the jurors have been challenged by one of the parties, it is not error for the court to require the other party to pass on the remaining eight jurors before the vacancies are filled.
3. *Trial and its incidents; casual remark of presiding judge to counsel, though unauthorized, will not work a reversal when it is shown that it was without prejudice.*—A casual remark made by a presiding judge in a case, to counsel upon the discussion of a legal question as to the admissibility of evidence, though made in the hearing of the jury, is not revisable on

[Schieffelin v. Schieffelin.]

appeal as a ruling or charge, when the record shows that it
was not intended for the jury; nor will such a remark work
a reversal of a judgment, when it is shown that any prejudice-
occasioned thereby was corrected by a full and fair explana-
tion on the part of the court.

4. *Contest of will; relevancy of evidence.*—Where the probate of a.
will is contested on the ground of the mental incapacity of the-
testatrix at the time of the execution of the instrument, and it
is shown that the testatrix was suffering from consumption,
after a physician has testified as an expert that in his opinion
the mind of a consumptive remained clear to the end, it is not.
competent to ask such witness on cross examination as to
whether he knew how many parts the brain was divided into;
such question calling for wholly immaterial and irrelevant.
evidence.

5. *Same; same.*—In such a case, after a physician as an expert
had given his opinion as to a consumptive's mind remaining
clear up to the time of his death, and on cross examination
he had testified that he had discussed the question with a
number of doctors of a certain city, naming them, it is per-
missible to ask such witness in rebuttal who were the re-
spective doctors referred to by him.

6. *Same; same.*—On the contest of the probate of a will between
the heirs of a testatrix, it is incompetent for the contestant
to ask the proponent, who was being examined as a witness,.
as to how much he received from his deceased father's estate,
and how much his brothers had received from his father's es-
tate, and what had been his occupation for a number of years;
such questions calling for evidence entirely irrelevant.

7. *Evidence; right of party to ask his own witness questions tend-
ing to contradict him.*—While a party may not contradict or
impeach his own witness, he may, when put to disadvantage
by an unexpected answer, or for the purpose of refreshing the
memory of the witness, ask him whether, at a certain time
and place, he did not make other statements inconsistent with
the testimony just deposed to; and this can be done though
the answer might have the incidental effect of impeaching the
witness.

8. *Contest of will; secondary evidence as to contents of letter.*
On the contest of a will, where the witness for the contestant
testifies to having received a letter from the testatrix, in
which she expressed her intention of disposing of her prop-
erty in a different manner from that shown by the will, it is
competent for the witness to state the contents of such letter,
in connection with the further evidence that she had destroyed
the letter, not thinking that it would ever be of any import-

[Schieffelin v. Schieffelin.]

ance, or that an action like the pending contest would ever arise for its use.

9. *Same; evidence as to declarations of testator.*—While, as a rule, declarations of a testator in respect to his will and the objects of his bounty, in order to be admissable, must not be so remote and disconnected from the execution of the will as to shed no light upon it, yet evidence of the declarations of a testator made through a series of years tending to show his intention to leave his property to the contestant, are admissible in evidence on the contest of said testator's will.

10. *Wills; may be executed by making mark.*—The making of a mark by a testator opposite his name signed to a will is a sufficient signature of the testator to said will.

11. *Same; attorney can be attesting witness.*—An attorney who writes a will, according to the directions of the testator, is competent to attest the same as a witness.

12. *Contest of will; charge to the jury as to undue inflence.*—On the contest of a will upon the ground of undue influence, a charge which instructs the jury that "if the jury believe from the evidence that the will was not obtained by the exercise of an influence amounting to coercion, by a motive tantamount to force or fear, such was not an undue influence;" asserts a correct legal proposition and the giving thereof at the request of the proponent is free from error.

13. *Same; what is undue influence.*—Undue influence which will avoid a will must amount to coercion or fraud destroying the free agency of the testator, and constraining him to do what is against his will; and mere persuasion or argument addressed to the judgment or the affections of the testator, in which there is neither fraud nor deceit, does not constitute undue influence.

14. *Same; testamentary capacity.*—If a testatrix has mind and memory sufficient to recall and remember the property she was to dispose of, the objects of her bounty and the disposition she wished to make, and knew and understood the nature and consequences of the business of making her will, and was able to discern the simple and obvious relations of these elements to each other, then such testatrix is, in legal contemplation, of sound mind and disposing memory and has testamentary capacity.

15. *Same; charge to the jury.*—Where the probate of a will is contested on the ground of undue influence and the want of testamentary capacity, charges which instruct the jury that if they are reasonably satisfied from the evidence that at the time of the execution of the instrument propounded for probate the testatrix did not have testamentary capacity to make

[Schieffelin v. Schieffelin.]

a will, then they need go no further in their consideration to ascertain whether there was fraud or undue influence, but their verdict should be for the contestant, asserts a correct legal proposition and should, at the request of the contestant, be given.

16. *Same; same.*—Charges to the jury which single out certain particular facts and upon the jury's finding them to exist, predicates a conclusion, without instructing the jury to consider all of the evidence in the case in order to justify such conclusion, are erroneous and should be refused.

17. *Charges to the jury; when properly refused.*—Charges requested by a party litigant, to be given to the jury, which are not, of themselves, complete and are not sufficiently intelligible to be understood by the jury, are erroneous and properly refused.

APPEAL from the Probate Court of Baldwin.

Heard before the Hon. CHARLES HALL.

The proceedings in this case were had upon an application of William L. Schieffelin to have admitted to probate what purported to be the last will and testament of Cornelia J. Schieffelin, deceased.

William L. Schieffelin was a son of the testatrix, Cornelia J. Schieffelin, and was the only child left surviving her. The testatrix had two other children, Mark and Lee Schieffelin. Mark died unmarried and without issue many years before the death of the testatrix, and Lee Schieffelin died prior to the testatrix, and left surviving him a wife and three children, all of whom were minors. Upon the filing of the application for the probate of the will, Lee Stark Schieffelin, one of the children of Lee Schieffelin, deceased, and grandchild of the testatrix, filed a contest of the probate of said will by and through his guardian. The issues presented upon this contest were, first, whether what purported to be said last will and testament of Cornelia J. Schieffelin was duly executed as required by law; second, whether the said Cornelia J. Schieffelin, deceased, was of sound and disposing mind at the time of making said will; third, whether the making of said will was obtained by undue influence or by fraud. At the time of filing the contest, the contestant made application that the said issues be tried by a jury and in accordance with said application a jury trial was ordered.

The bill of exceptions contains the following recitals as to the organization of a jury for the trial of the issues presented: "After the sheriff had called the venire summoned to try the issues in this cause, and thirteen jurors answered to their names, the court asked if any of the jurors were related to William L. Schieffelin, or to Mrs. Cornelia J. Schieffelin, deceased, or to the defendant in this cause, or had they made up their minds in regard to this matter. And thereupon one of the jurors, Mr. Oswalt, stated to the court as follows: 'I do not know whether this will be suitable, I have had a similar case of my own. I might say I have a little prejudice about it in a case of this kind.' And thereupon the court asked the juror the following question: 'Do you think your prejud ce will be so great as to bias your verdict?' And said juror answering said: 'To some extent we are all more or less biased by prejudice. Of course I would be governed by the evidence.' And thereupon the proponent insisted that said juror was incompetent as shown by his own statement; and the contestant insisted that he was not, and asked the ruling of the court. And thereupon the court ruled said juror was incompetent, and excused him, and the contestant then and there duly excepted to the action of the court in excusing said juror. Thereupon the jury, consisting of twelve jurors, ascertained by the court to be competent, was put upon the proponent to pass upon ; and the proponent thereupon challenged four of the twelve peremptorily, leaving eight jurors seated. And thereupon the proponent claimed and moved the court to require the contestant to pass upon the eight jurors left in the jury box aforesaid before making an order to the sheriff to complete the jury under the law, which motion the contestant resisted, claiming the right to have a full panel of twelve jurors presented to him before he should be required to exercise any of his peremptory challenges; but the court ruled that the contestants must pass upon the eight jurors first, and granted the motion of the proponent requiring him to pass upon said jurors. And to this action of the court the contestant then and there duly excepted."

The will which was sought to be probated was signed by Cornelia J. Schieffelin, making her mark, and was

witnessed by Frank S. Stone and George B. Schieffelin. Under the provisions of the will, the testatrix bequeathed to each of the three children of Lee Schieffelin the sum of one hundred dollars, and all the residuum of her estate, both real and personal of every kind, nature and description, she devised and bequeathed to William Schieffelin. William Schieffelin was nominated executor without bond.

It was shown that Cornelia J. Schieffelin, the testatrix had, for several years prior to her death, suffered from pulmonary consumption, and that she had been confined to her bed for several weeks prior to her death; that at the time of her death and for several years prior thereto she lived with her son, William Schieffelin. The will was executed on November 13, 1898, which was the date of her death.

George B. Schieffelin, who was the son of William Schieffelin and the grandson of Cornelia J. Schieffelin, as a witness for the proponent, testified that on the morning of the day the testatrix died, he was in her room, and during a conversation which his grandmother had with him, she stated that it was her intention that her son William, the father of witness, should have all of her property; stating at the time that the other children of herself and her deceased husband, had been better provided for by the will of their father than had William Schieffelin, and that she had given both Mark Schieffelin during his life, and to Lee Schieffelin during his life, and to the latter's wife and children after his death, all that they were entitled to or could ask from her. The witness further testified that he then stated to his grandmother that if she wished her property to be so disposed of it would be necessary for her to make a will providing for such disposition of her estate; that upon Cornelia J. Schieffelin replying that she did not consider it necessary, as everybody knew her wishes in the matter, the witness stated that his uncle, Lee Schieffelin, had children who would be entitled to share in her estate, and that it was only by a will her son, William Schieffelin, would be entitled to her property. That thereupon his grandmother asked him if he could get a lawyer to write a will for her; and upon being told that he could get Frank S. Stone, Esq., she instructed him to bring

said Stone to her. That this conversation was between 10 and 12 o'clock on the morning of the 13th of November, and that in accordance with his grandmother's wishes, he went to the home of said Stone, who resided between one and a half and two miles from the residence of William Schieffelin. That he told Stone that his grandmother wished him to write her will for her, and Stone came back to the house with him; that he and Stone went into the room where his grandmother was lying in bed; that there was no other person in the room with Stone, that Stone then asked Cornelia J. Schieffelin how she wished to dispose of her property by her will, and upon being told that she wished to give one hundred dollars to each of the children of Lee Schieffelin and all the rest of her property, both real and personal, to William Schieffelin, Stone sat down in the room and wrote the will according to her directions, which is the paper offered to be probated. That after the will was prep ·
Stone read it over to Cornelia J. Schieffelin, and she said that it was in accordance with her wishes; that Cornelia J. Schieffelin then asked Stone if he could not sign her name for her, and if he, Stone, and the witness, George B. Schieffelin, could not attest the signature; that thereupon Stone signed the testatrix' name to the will and she made her mark thereto, and in the presence of the testatrix Stone and the witness Schieffelin signed the will as attesting witnesses. This witness further testified that the will was signed about half past 3 o'clock or 4 o'clock in the afternoon of November 13th, and that the testatrix died a few minutes after 5 o'clock; that at the time of the signing of the will she was of sound mind, and gave directions as to the disposition of her property in the way to indicate that she knew what she was doing; and that the will disposed of her property in accordance with her desire. The witness further testified that after the signing of the will he and Frank S. Stone left the room and went in another part of the house where his father, William Schieffelin, was; that a few minutes thereafter the witness returned to the room of his grandmother where he found his mother, and they remained in the room until Cornelia J. Schieffelin died, and that during that time he and his mother

conversed with Cornelia J. Schieffelin, and she showed no mental weakness up to a few moments before she expired.

William Schieffelin, the proponent, testified that in the morning of the day his mother died, she also stated to him that she wished him to have all of her property after her death; that he thereupon told her that unless she made a will so providing for the disposition of her property, the children of his deceased brother, Lee Schieffelin, would share in her estate; that in response to this, Cornelia J. Schieffelin replied that she had given to Lee Schieffelin and his children all they were entitled to, and that his father had provided for Lee and Mark more bountifully than he did for William, and that therefore her desire was that he, William, should have the property she left. William Schieffelin further testified that he knew nothing of the conversation between the deceased and his son, George Schieffelin, and that he had nothing to do with George going to get Mr. Stone in order to get him to prepare the will, and did not induce his mother to send for said Stone, nor did he, in any way, persuade her to make the will as it was written.

Frank S. Stone, a witness for the proponent, testified to the circumstances of the making of the will substantially as did George B. Schieffelin. On cross examination he was asked if he did not state to certain designated people that in writing the will he wrote faster than he had ever done, as he was afraid Mrs. Schieffelin would die before he finished it, and that as it was, she died within from five to twenty minutes after she signed the will. The witness in response to this question answered that he may have made such statements, but as a matter of fact she lived for an hour and a half or two hours after the will was executed by her.

Dr. W. J. Lea, as a witness for the proponent, testified that he knew Mrs. Cornelia J. Schieffelin and had known her ever since he was a child; that he considered her a woman of wonderful determination of character and of very strong will; that she was a woman of intelligence and sound mind; that in the year 1897, having been called to attend one of William Schieffelin's children who had sustained an injury to her arm, he had occasion to

talk. with Mrs. Cornelia J. Schieffelin; that in this conversation she displayed great anxiety for the child, and spoke very kindly and motherly in reference to William Schieffelin; that during the conversation she stated to him that it was her intention to leave her property to William Schieffelin inasmuch as Lee and Mark had been provided for. This witness, after having testified that he was a practicing physician of eleven years' experience, stated that as a general thing with consumptives, their mind remained clear up to the moment of their death. On cross examination he stated that he had discussed this fact with other reputable physicians in Mobile, and that in this discussion they expressed themselves as being of the same opinion. The rulings of the court upon the evidence during the examinatio this witness are sufficiently shown in the opinion. This witness further testified that he was of the opinion that the testatrix thought more of her son William than she did of her other children. It was shown by the testimony of the witnesses examined for the proponent and the contestant that Mrs. Cornelia J. Schieffelin was a woman of great determination of character, of great independence, of intelligence and mental vigor; and it was further shown that she looked after her own affairs and had her business conducted through agents, and that neither William Schieffelin nor any of his family had any connection whatever with her business affairs. It was undisputed that the testatrix died between 5 and half past 5 o'clock on November 13th, 1898.

During the cross examination of William Schieffelin he was asked by the contestant how much he had received from his father's estate, and also as to how much his brothers had received from said estate. He was also asked what had been his occupation for the last twenty years. To each of these questions the proponent separately objected upon the ground that it called for irrelevant, illegal and incompetent evidence. The court sustained the objection, and the defendant duly and separately excepted to each of such rulings.

Miss Jane Yancey and Mrs. O'Neal, witnesses for the contestant, testified that they were at the house of William Schieffelin at the time Cornelia J. Schieffelin died.

Mrs. O'Neal testified that in the afternoon of said day she and Miss Yancey went by to inquire as to Mrs. Schieffelin's condition; that upon reaching the house they were informed that Mrs. Schieffelin was resting; that they were asked into the parlor, and after remaining in there a while, William Schieffelin left the parlor, and after having been gone a few moments returned and said that his mother was dying, and that they went to the room just as she was breathing her last. That this was late in the afternoon, but they did not know exactly the time it was, but was sure it was after 3 o'clock.

The evidence for the contestant tended to show that Mrs. Cornelia J. Schieffelin was very fond of the widow of Lee Schieffelin and his children, and that she was from time to time helping them; that while she lived with William Schieffelin she supported him and his family, and was, to a certain extent, under his influence.

Mrs. Amelia Sibley, a witness for the contestant, testified that in a conversation she had with the testatrix about two weeks before she died, the testatrix told the witness that she never approved of wills, and that during the conversation she spoke very kindly and lovingly of Mrs. Lee Schieffelin and her children. It was proved by several merchants that the groceries which were supplied to the family of William Schieffelin were paid for by the testatrix.

The deposition of Mrs. Essie Schieffelin, the widow of Lee Schieffelin, was introduced in evidence, and in this deposition she testified that Mrs. Cornelia J. Schieffelin had always been exceedingly kind to her husband and herself, and after the death of Lee Schieffelin, the testatrix had, at different times, given aid to the witness and always manifested a fondness for her and her children. In her deposition this witness further testified that in letters which Mrs. Cornelia J. Schieffelin had written to Lee Schieffelin and to the witness, she had stated that she expected to help them, and had at different times asked them to visit her, but that after she went to live with the proponent, William Schieffelin, she stated in her letters that she was afraid for them to visit her inasmuch as she feared that William Schieffelin might do them serious harm. That in different letters which she had written, she had stated that she did

not intend to make a will, inasmuch as there were only two interests, and her property would, therefore, be divided equally between Lee and William Schieffelin; that one reason why she would not make a will was that she was afraid that if she did make one, her son Willie Schieffelin, would kill Lee Schieffelin, and that Lee and his children would get one-half of her estate any way, and that she felt disposed to give Lee more, inasmuch as she had done so much more for William and his family than she had done for Lee, and she was afraid if she disposed of her property in that way William would kill Lee and all his family. The witness further testified that after she moved to Augusta, Georgia, where she was living at the time her deposition was taken, which was after the death of her husband, the testatrix in a letter to her had said that she wanted the witness to select a home, not to cost more than $6,000, and that she would send the money with which to make the first payment, and would provide for the payment of the balance. The proponent separately excepted to each portion of this witness' testimony with reference to the contents of the letters which had been written by the testatrix to the witness, and moved to exclude the same. The court sustained the objection, excluded said portions of the witness' testimony, and to each of these rulings the contestants separately excepted. It was further shown that Mrs. Essie Schieffelin, the widow of Lee Schieffelin, was in a very destitute condition, and in straightened financial circumstances, and that she had to provide for herself and children by her own labor. Other witnesses for the contestant testified that the testatrix had at different times before her death stated that she did not approve of wills and did not intend to make one. The facts pertaining to the other rulings of the court upon the evidence to which exceptions were reserved are sufficiently shown in the opinion.

Upon the introduction of all the evidence the court, at the request of the proponent, gave to the jury the following written charges: (1.) "If the testatrix, Mrs. Schieffelin, was of sound mind when she executed her will, the fact that she was very weak in body from the disease of pulmonary consumption and was then in a

dying condition, and did die very shortly after the will
was executed, would not invalidate the will so made."
(2.) "If a will is made by a person of sound mind the
mere fact that she may have died even within five min-
utes after the execution of the will would afford no just
or valid reason to set aside such a will." (3.) "The court
charges the jury that an influence to be an undue in-
fluence such as will be sufficient to vitiate a will, must
be such as in some degree to destroy the free agency of
the party making the will, and such as to constrain her
to do what is against her will." (4.) "If the jury be-
lieve from the evidence that the will was not obtained
by the exercise of an influence amounting to coercion, by
a motive tantamount to force or fear, such was not an
undue influence." (5.) "The court charges the jury
that an influence, to be an undue influence, must be such
as in some degree to destroy the free agency of the party
making the will, and such as to constrain her to do what
is against her will." (6.) "Although the jury may be-
lieve that the will is unreasonable in its provisions, and
that the testatrix ought to have given more of her prop-
erty to her three grandchildren than she did, still this
of itself would not invalidate her will nor raise a pre-
sumption that she was of unsound mind, nor that the
will was obtained from her by fraud or undue influence."
(7.) "The court charges the jury that if they believe from
the evidence that Cornelia J. Schieffelin, at the time she
made the will, had a sound disposing mind she could
make a will. That for her mind to be a sound, disposing
mind, it is not necessary that her memory be perfect,
and her mind be unimpaired; but, if she had mind and
memory enough to recollect the property she was about
to bequeath, and the person to whom she wished to will
it, and the manner in which she wished it to be disposed
of, and to know and understand the business she was
engaged in, then in contemplation of law, she had a
sound, disposing mind; and her great age, bodily in-
firmity, and impaired mind, if impaired mind, and near
approach of death, do not vitiate a will thus made." (8.)
"To set aside a will of a person of sound mind for having
been obtained by undue influence, it is not sufficient to
show that the circumstances attending its execution are

consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis, that is inconsistent with having been made freely and voluntarily, and the undue influence must be exercised in relation to the will itself, not an influence in relation to other matters or transactions." (9.) "That unless the evidence shows that the will was obtained by moral coercion, or by importunity which could not be resisted by the testatrix, the jury must find that issue in favor of the proponent." (10.) "The burden of proof to show undue influence is on the contestant in this case." (11.) "The influence which the law calls undue influence, and which must be shown to vitiate a will upon the ground of undue influence, must be an influence exerted at the time of the execution of the will or must have such a relation to its execution as that the jury believes from it that the will was executed under such influence." (12.) "The burden of proof as to testamentary incapacity is on the contestant, and is not shifted except by proof of habitual and fixed insanity on the part of the testatrix prior to the making of the will, or otherwise shows a testamentary incapacity at the time the will was executed." (14.) "The court charges the jury that testator's attorney is a competent attesting witness." (15.) "The fact that Mrs. Schieffelin's will gives the bulk of her property to her only living son, the proponent in this case, and gives a legacy of only one hundred dollars to each of Lee Schieffelin's three children, is a proper matter to be weighed and considered by the jury in connection with all the other evidence in the case, and if the unequal distribution by her of her own property can be ascribed to a legitimate or lawful influence rather than to an unlawful or undue influence, it would be the duty of the jury to ascribe or refer it to the lawful or legitimate influence." (16.) "The court charges the jury that testatrix' name may be signed for her by another in her presence and by her direction, and that such signature is as valid as if made by herself." (17.) "The court charges the jury that an influence, to be an undue influence, must be such as, in some degree, to destroy the free agency of the party making the will, and such as to constrain her to do what

is against her will." (18.) "If Willie Schieffelin had by his love, kindness and dutiful conduct to his mother and obedience to her so won her affection as to influence and cause her to give the bulk of her property to him, then this would be a legitimate and lawful influence." (19.) "The court charges the jury that William L. Schieffelin is the plaintiff, and Lee Stark Schieffelin, by Charles L. Bromberg, guardian, is defendant in this case." (20.) "The court charges the jury that a will may be made by the testatrix's name being signed for her by another in her presence, and by her direction, and that such signature is as valid as if she signed it herself." (21.) "The court charges the jury that testatrix, Mrs. Cornelia J. Schieffelin, could have signed her name by making her mark, or touching the pen, and that such a signature is as valid and legal as if she had written her name herself." (22.) "The court charges the jury that a will which makes an unequal division of property raises no presumption of the insanity of the testatrix, and if the testatrix be free from any undue influence and no actual insanity be shown, she may make such a disposition of her property as partiality or caprice may dictate." (23.) "If the jury believe from the evidence that the deceased, Cornelia J. Schieffelin, instructed the witness, F. S. Stone, how she wanted her will written, the way she wished to will or dispose of her property, and requested said Stone to write out her will for her, and that he did so according to her instructions, and that the will was then read over to her and she signed it in the presence of said F. S. Stone and George B. Schieffelin, and that said F. S. Stone and G. B. Schieffelin, at the request of said testatrix, Cornelia J. Schieffelin, and in her presence and in the presence of each other, signed their names to said will as witnesses, then said will was legally and properly signed and executed according to the law of Alabama." (25.) "There is no evidence in this cause of any importunity by Willie Schieffelin of his mother to induce her to make the will in controversy." (27.) "If Mrs. Schieffelin was of sound mind she could will and dispose of her property to whom she pleased, and the fact that she had lived for the last ten years or thereabouts, of her life with her son Willie, and that for about two years before her death she was suffering from

pulmonary consumption from which disease she had become very weak in body, and the fact that she willed only one hundred dollars to each of the three children of Lee Schieffelin, and willed all the balance of her property to her said son Willie, affords no presumption that she was not of sound mind when she made the will, nor that such will was the product of fraud or undue influence practiced upon her." (29.) "Under the issue as to the mental capacity of the deceased Cornelia J. Schoeflelin, the court, at the request of the proponent, charges the jury that when it is proven. that a will has been duly executed by one over twenty-one years of age, in writing, in the presence of two or more witnesses, then the burden of proving the mental incapacity of the party to make a will is on the contestant, and even if it should be shown in this case that Mrs. Cornelia J. Schieffelin was at the time of making her will afflicted with consumption, and was from that disease in a dying condition, and that this had a tendency to produce mental weakness, and that from that cause she had not sufficient mental capacity to clearly and intelligently understand and transact the business affairs of life, and was not at the time in a mental condition to clearly discriminate between objects of affection and interest to her, and objects of no interest or importance to her, this would not be sufficient to show that said Cornelia. J. Schieffelin, when she signed the paper offered for probate, was not of sound and disposing mind, memory and understanding, and it would not be sufficient to show that she was not competent to will, devise and bequeath her real and personal estate by the instrument in writing offered for probate by said William L. Schieffelin." The court gave a charge explanatory of the 29th charge, the substance of which is shown in the opinion. (31.) "On the question of undue influence, the court charges the jury at the request of the proponent, that they can not find that the paper propounded for probate in this case was obtained by undue influence unless the contestant has reasonably satisfied the jury by a preponderance of the evidence in the cause that it was not such a will as Cornelia J. Schieffelin desired to make, and that it was procured from her by the use of coercion or fraud." (33.)

"If the jury believe from the evidence that at the time when the paper propounded for probate by William J. Schieffelin as the last will of Cornelia J. Schieffelin, was executed by said Cornelia J. Schieffelin and witnessed by F. S. Stone and George B. Schieffelin as subscribing witnesses thereto, the said Cornelia J. Schieffelin had mind and memory sufficiently sound to know and understand the business in which she was engaged, then she possessed testamentary capacity, and they should find that issue for the proponent."

The defendant separately excepted to the giving of each of these charges, and also separately excepted to the court's refusal to give, among others, the following written charges requested by him: (67.) "The court charges the jury on behalf of contestant, that if the jury are reasonably satisfied from the evidence that at the time of the making of the mark to the instrument propounded for probate in this case, Cornelia J. Schieffelin did not have testamentary capacity to make a will, the verdict must be for contestant, and in this event they should disregard and not consider the charges on the subject of undue influence and fraud, and what it takes to constitute undue influence and fraud as in such event they are immaterial inquiries." (68.) "The court charges the jury on behalf of contestants, that the burden of proving the due execution of the will, William Schieffelin, and if he has failed to prove that the will was duly executed to the reasonable satisfaction of the jury the jury must find for the contestant, and all the charges given by the court on the questions of testamentary capacity, fraud and undue influence in this event should be disregarded by the jury entirely." (70.) "If the jury believe from the evidence to their reasonable satisfaction that the deceased at the time of making the mark to the paper propounded for probate did not have testamentary capacity, then they need go no further in their consideration to ascertain whether there was fraud or undue influence. And it would be the duty of the jury under the law for this reason alone to render a verdict in favor of the contestant and against the validity of the said paper propounded for probate."

There was a verdict returned in favor of the proponent. Thereupon a decree was rendered admitting the

[Schieffelin v. Schieffelin.]

will to probate. From this decree the contestants appeals, and assigns as error the several rulings of the trial court to which exceptions were reserved.

CHAS. L. BROMBERG, for appellant.—The general rule at common law is that no peremptory challenges could be made until the panel was filled.—12 Encyc. Pl. & Pr. 498; Abbot Trial Brief, 22; *Smith v. Kaufman*, 100 Ala. 409; *Bobker v. Bell*, 49 Ala. 291.

During the examination of the witness Edmonson, for the contestant, the court made the following statement in the presence of the jury: "Frank Stone's testimony has not been impeached." This was a most glaring invasion of the province of the jury.—*Crawford v. State*, 112 Ala. 25; *Harris v. State*, 96 Ala. 28; *Griffin v. State*, 90 Ala. 601; *McKenzie v. Branch Bank*, 28 Ala. 610; *Single v. Greenleaf*, 100 Ala. 272.

The law is well settled that it is not a valid objection to the material and revelant answer of a witness contained in his deposition that it is not responsive to questions to the witness unless the objection was made before the trial was entered upon.—3 Brick. Dig. p. 446, §§ 605-9. And it is equally well settled law that it is too late to object to an answer contained in a deposition when none is made to the question to which it is responsive. *Buford v. Dement*, 72 Ala. 493; *L. & N. R. R. Co. v. Hale*, 91 Ala. 119; *Wilkinson v. Mosely*, 30 Ala. 572; *Downey v. State*, 115 Ala. 111.

Declarations as to her intentions in making disposition of her property made prior to her execution of her will, in a case where the will makes a different disposition, are admissible as a circumstance to show that testator was unduly influenced, or did not have testamentary capacity.—*Bulger v. Ross*, 98 Ala. 273; *Hughes v. Hughes*, 31 Ala. 524; *Hilery v. Hall*, 106 Ala. 100; *Seal v. Chambliss*, 35 Ala. 19; *Coghill v. Kennedy*, 119 Ala. 641.

The fact that a will makes an unnatural and inequitable disposition of the property is a circumstance tending to show fraud or undue influence in the execution of the will.—*Fountain v. Brown*, 38 Ala. 74; *Estes v. Mont-*

*gomery*, 95 Ala. 492; *Estes v. Montgomery*, 93 Ala. 299; *Stubbs v. Houston*, 33 Ala. 555.

This court has said: "If testamentary capacity does not exist there is no room for the operation of fraud or undue influence. .* * * It is only to such persons as have testamentary capacity, and who have been deceived by fraud or unduly influences, that evidence of fraud or undue influence is relevant."—*Burney v. Torrey*, 100 Ala. 168. "Upon the contest the proponent must prove the due execution of the will."—*Barnwell v. Murrell*, 108 Ala. 389; *Hughes v. Hughes*, 31 Ala. 524; *Fountain v. Brown*, 38 Ala. 745.

Costs should not be taxed against a guardian *ad litem* in the court appointing him, and thereby punish the guardian *ad litem* for making a *bona fide* defense for his minor in the litigation. Such a proceeding would be outrageous, and would prevent minors defended by guardians *ad litem* in many instances from being properly defended.—*Perryman v. Burgster*, 6 Port. 421; *Brown v. Williams*, 87 Ala. 357.

F. S. STONE and L. H. & E. W. FAITH, *contra*.—There is no reversible error in the court excusing the juror Oswalt. The court was obliged to excuse one of the thirteen men, and the record does not show that the appellant was denied an impartial trial before a jury of twelve good, lawful men. The uniform decisions of this court would sustain the action of the lower court, even had there been only twelve men present instead of thirteen.—*Tatum v. Young*, 1 Port. 298; *State v. Marshall*, 8 Ala. 302; *Bibb v. Hoyt*, 3 Ala. 88; *Haynes v. Crutchfield*, 7 Ala. 196; *Adams v. Olive*, 48 Ala. 551; *Smith v. State*, 55 Ala. 1; *Griffin v. State*, 90 Ala. 596; *Williamson v. Mayer Bros.* 117 Ala. 253.

An exception is taken to the remark made by the trial judge in ruling upon an objection to a question asked by appellee on cross examination of appellant's witness Edmonson. This court will not "review every casual remark that may be made by the presiding judge pending the trial, made probably by way of illustrating an argument, unless, upon a charge given or refused, such remark is, in effect, made part of the court's instructions

to the jury."—*Meinaka v. State,* 55 Ala. 47-55; *Campbell v. State,* 55 Ala. 83; *Phillips v. Beene,* 16 Ala. 720.

Under the issue of undue influence, two lines of inquiry are opened up. First, the conduct of those charged with the exercise of undue influence; and, second, the effect of this conduct upon the mind of the testator—that is the mental state produced by it.—*Coghill v. Kennedy,* 119 Ala. 641; *Shaler v. Bunstead,* 99 Mass. 112; *Rusling v. Rusling,* 36 N. J. Eq. 603; *Boylan v. Meeker,* 28 N. J. L. 274; 27 Amer. & Eng. Encyc. of Law, (1st ed.) 505; *In re Evans' Will,* 123 N. C. 113.

Evidence to show the mental status of the testatrix must have reference to the time of the doing of the act. Hence declarations made a reasonable length of time before or after the execution of the will, are admissible for the purpose of showing the condition of the mind of the testatrix.—*Bunyard v. McElroy,* 21 Ala. 311.

The excluded evidence was not the oral declaration of the testatrix made to the witness, but was the witness' construction or conclusion of the contents of some supposed or alleged letters received by witness, or by her husband from the testatrix and there was no evidence whatever as to the genuineness of such letters. No proof of the genuineness or execution of such letters was offered.—*O'Connor Co. v. Dickson et al.* 112 Ala. 304; *High v. Ogletree,* 114 Ala. 94-106; *White v. Toliver,* 110 Ala. 300; *Kellar v. Taylor,* 90 Ala. 289; *Shields v. Lewis,* 49 S. W. Rep. 803.

The charges given at the request of the appellee asserted correct propositions of law and were free from error.—*Couch v. Couch,* 7 Ala. 519; *Leiper v. Taylor,* 47 Ala. 221; *Eastis v. Montgomery,* 95 Ala. 486; *Henry v. Hall,* 106 Ala. 89; *Knox v. Knox,* 95 Ala. 495; *O'Donnell v. Rodiger,* 75 Ala. 322; *Mosser v. Mosser,* 32 Ala. 551; *Bancroft v. Otis,* 91 Ala. 279.

HARALSON, J.—1. There was no error in the action of the court in excusing the juror, Oswalt. It was entirely within the discretion of the court,—exercised not arbitrarily, but for good purpose in the interest of justice,—to do so.—*Williamson v. Mayer,* 117 Ala. 253;

[Schieffelin v. Schieffelin.]

*Fariss v. State,* 85 Ala. 1; *The State v. Marshall,* 8 Ala. 302.

Nor was there error in requiring the defendant to pass on the eight jurors remaining, after four had been challenged by plaintiff, before their vacancies were filled.—*Wilson v. State,* 31 Ala. 371; *Bell v. Barker,* 49 Ala. 284.

2. The defendant's witness, Edmondson, had given evidence of some contradictory statements made by plaintiff's witness, Stone, and on his cross examination by plaintiff, he was asked, "When you get Frank Stone on the stand and he swears to anything, would you or not believe him on oath?" The defendant objected to the question, "because the character of Mr. Stone was not in issue." The court stated, it "would sustain the objection, and as a reason therefor, remarked in the presence of the jury, that Frank Stone's testimony had not been impeached." This remark was casual and to counsel, drawn out by his objection to the question propounded. Counsel for defendant, after consulting a law book, stated to the court that Stone's character was in issue, and the question should be allowed to be asked, and withdrawing his objection to it, it was allowed to be answered. The court, afterwards, also, at the request of the defendant, charged the jury that "a witness may be impeached by contradictory statements made by him." It thus appears that this remark, evidently intended for counsel alone, and not for the jury, and induced as it was by defendant's objection to the question propounded, which objection was under consideration at the time, if erroneous as to the matter in hand, contained no reversible error, especially as a correction was fully and fairly made by the court.—*Meinaka v. State,* 55 Ala. 47; *Campbell v. State, Ib.* 80; *Harrison v. State,* 78 Ala. 11; *Griffin v. State,* 90 Ala. 596.

3. Dr. Lea had been examined by proponent touching a visit he made to testatrix some time before her death, and in reference to the effect the disease of the lungs called consumption,—with which it was shown testatrix died,—has on the mind. He testified among other things that the effect of consumption was the wasting away of the lungs, leaving a smaller space for breathing, result-

ing in a failure to give proper oxygen to the blood, causing death from general emaciation of the whole body; but that the brain suffered less than any of the other organs, and the mind, with many patients, was clear up to the end; that he had discussed that fact with the principal doctors of Mobile, naming Drs. Ketchum, Thomas, Owens, Mastin and Goode, and they said such had been their experience. Thereupon, on the cross, contestant's counsel asked the witness, "Do you know how many parts the brain is divided into," to which question, the court sustained an objection by plaintiff. The question was apparently irrelevant. What the divisions of the brain had to do with what the witness had been deposing, does not appear. But, whether the question should have been allowed to be answered or not was a matter within the discretion of the court.

Nor was there error in allowing plaintiff to ask in rebuttal, "Who is Dr. Ketchum?"—and the other physicians mentioned by the witness, on his cross examination, as being among the principal physicians in Mobile. Having himself elicited from the witness the names of these physicians, and what they said, the defendant could not complain, that the witness was allowed to repeat for the plaintiff, what he had said about these physicians at the instance of defendant,—that each of them was one of the principal physicians in Mobile.

The questions propounded by defendant to the plaintiff on his cross examination, as to how much he had received from his father's estate; how much either one of his brothers got out of said estate, and what had been the occupation of plaintiff for the last twenty years, were irrelevant and entirely within the province of the court to disallow on the cross examination.—*Huntsville B. & L. Co. v. Corpening,* 97 Ala. 687; *Strauss v. Meertief,* 69 Ala. 299.

4. Mrs. O'Neal, examined by defendant, as to the death of testatrix, and who was present at the time, testified that when she and others arrived, they were met by plaintiff and his wife and were shown into the parlor by plaintiff, and were informed by his wife, that testatrix was resting; that plaintiff remained in the parlor about an hour and went out and remained 15 or

20 minutes, when he came back and told her that his mother was gone. Contestant asked the witness "Did not you tell me, coming along over to the court house this morning, that you thought it was about 5 minutes that Wm. Schieffelin was out before he returned?" To this question plaintiff's counsel objected, because illegal and irrevelant, and because counsel for defendant could not prompt nor contradict his witness. The rule is well settled with us, that while a party may not contradict or impeach his own witness, he may, when put to disadvantage by an unexpected answer, or for the purpose of refreshing the memory of the witness, ask him, though the question might have the incidental effect of impeaching the witness, whether, at a certain time and place, he has not made other statements inconsistent with testimony as just given.—*White v. State,* 87 Ala. 24; *Thomas v. State,* 117 Ala. 178. But, what bearing the question, whether plaintiff was out of the parlor 15 or 20, or 5 minutes had on the issue involved, we have been unable to conjecture, nor has any attempt been made by counsel to show the relevancy of the question. It appears to have been totally irrelevant.

5. The plaintiff objected to certain portions of the deposition of Mrs. Essie Schieffelin, when offered in evidence. She was the widow of Lee Schieffelin, a son of testatrix, and the mother of contestant, and deposed to having received a letter from testatrix about two weeks before her death, in which she stated that she was glad that witness had moved to Augusta; that she desired her to select a house as soon as practicable, not to exceed in cost $6,000; that she would send her the money with which to make the first payment, and would provide for payment of the balance. The plaintiff moved to exclude this part of said letter because the letter itself was the best evidence and should be produced or accounted for; because the witness did not attempt to give its language, and because it was immaterial and irrelevant. The witness testified that she had destroyed the letter, with others, because, as she stated, she did not think it was of any importance, and did not for a moment dream that anything of this kind

would arise. The objections to the evidence were not well taken. The witness gave the contents of the let-ter, and the words employed, using the indirect instead of the direct form of speech, in doing so; it was shown to have been destroyed, and it was, certainly, material. The evidence was not subject to the objections interposed to it. In *Coghill v. Kennedy,* 119 Ala. 663, it was said, that as "the mental condition of a person can be determined only by his acts and declarations, these are admissible (on the issue of undue influence) whether made a reasonable time before or after the execution of the will, to establish everything pertaining to the testator himself,—his memory, intentions, idiosyncracies, prejudices, affections, relations with and feelings towards the beneficiaries, and all those who, if he had died intestate, would have been entitled to share in the distribution of his estate, and towards those charged with the undue influence."—*Bunyard v. McElroy,* 21 Ala. 311.

It is a general rule, that the declarations of a testator in respect to his will and the objects of his bounty must not be so remote and disconnected with the act done as to shed no light upon it, yet, evidence of the declarations of a testator made through a series of years tending to show his intention to leave his property to a contestant, are admissible. Authorities *supra; Seale v. Chambliss,* 35 Ala. 19; *Hughes v. Hughes,* 31 Ala. 519. The evidence of the contents of the letter just referred to and of other letters said to have been written by testatrix to her son, Lee Schieffelin, the husband of the witness, Mrs. Essie Schieffelin, though remote in point of time from the execution of the will, was material in connection with other evidence of a similar character, proximately connected with the transaction, and should not have been excluded.

6. It is well settled in this State, that the making of a mark is a sufficient signature to a will.—*Bailey v. Bailey,* 35 Ala. 690. And it is equally well settled, that an attorney who writes a will may attest the same.— *Mosser v. Mosser,* 32 Ala. 551.

7.   Charge No. 4 requested by plaintiff and given, is a copy of charge 2 in the case of *Eastis v. Montgomery,* 95 Ala. 486, which was there held to be good on the authority of the same case on another appeal (93 Ala. 293) and the authorities in the last case cited.  Of course, the terms coercion, force or fear, when applied to undue influence and its results, are relative terms, owing to the character and condition of the party at the time upon whom such influence was exerted, and what would amount to such a degree of undue influence in one case, might not have the same result in another. Strength of will, age, infirmity, loss of mental power,— not amounting to deprivation of testamentary capacity in the testator,—are elements entering into the consideration of every will contested on the ground of undue influence exercised over him in procuring him to make it different from what he otherwise would have done.—*Burney v. Torrey,* 100 Ala. 157; *Knox v. Knox,* 95 Ala. 495.

Charge 8 given for proponent is a copy of charge 18, approved in *Knox v. Knox, supra.*

Charge 29 given for proponent, is erroneous.   The facts there hypothesized as to the condition of testatrix, not only do not indicate testamentary capacity, but show the want of it.   We are unable to conceive of testamentary capacity remaining after such incapacity as is here postulated, and we have been cited to no case in this State, that sustains such a charge.   Incapacity to transact the ordinary business of life, cannot as is well settled, be made the standard of testamentary capacity.   We apprehend the court in an explanatory charge laid down the rule correctly, that if testatrix "at the time of the execution of the instrument, had mind and memory sufficient to understand the business she was engaged in, to remember the property she was about to bequeath, the objects of her bounty and the manner in which she wished to dispose of it, (she had testamentary capacity), and if at the time of executing said instrument, this test was lacking (she was without such capacity)."   This is the standard declared in many of our decisions.—*Taylor v. Kelly,* 31 Ala. 59; *Stubbs v. Houston,* 33 Ala. 555; *O'Donnell v. Rodiger,*

76 Ala. 223, 228; *Kramer v. Weinert*, 81 Ala. 416. The court had instructed the jury that the burden was on the contestant to show mental incapacity. The explanation given of the charge by the court, did not cover the defects in the charge as asked, to relieve it of its injurious effects on the mind of the jury. If the charge was illegal, not simply misleading, it should have been refused; and no explanation or qualification of it, could make it good.—*Eiland v. State*, 52 Ala. 323.

Charge 25 given for proponent was bad. The evidence affords ample room for inference by the jury of undue influence exercised by proponent over testatrix to induce her to make the will, without reference to any actual importunity on proponent's part to induce her to do so, and the facts tending to show this, should have been left to the jury.

Charge 27 was faulty. While the fact of the unequal disposition of her property, did not *per se* authorize the inference that testatrix was of unsound mind, and that her gifts were the result of fraud or undue influence, yet there was other evidence tending to show undue influence and mental incapacity, and this was competent to be considered, together with all the evidence in the cause, in determining these questions.—*Burney v. Torrey*, 100 Ala. 157, 169.

Charge 39 was also bad, in postulating that certain named facts afforded no presumption that the will was the result of undue influence, and that testatrix was of unsound mind when she made the will. The evidence afforded inferences both of undue influence and of mental incapacity, and it was for the jury under all the evidence to determine these questions.

We find no reversible error in the other charges given at plaintiff's request.

8. Charge 68 of defendant which was refused, is incomplete, and the court was justified in refusing it in the language in which it was written.

Charges 67 and 70 asked by defendant and refused, should have been given, as they assert correct propositions of law. The only objection raised against them by the plaintiff for their proper refusal, is that they are substantial repetitions of other charges given for the

[Kyle v. Perfection Mattress Co.]

defendant, but this, on examination of those other charges, we find not to be so.

The other refused charges of defendant, were either argumentative, misleading or otherwise faulty.

For the errors indicated, the decree of the probate court must be reversed and the cause remanded.

Reversed and remanded.