[Hickman v. The State.]

# Hickman *v.* The State.

## *Murder.*

(Decided February 11, 1915.  67 South. 775.)

1. *Witnesses; Impeachment.*—While a party cannot directly impeach his own witness as to his character for the purpose of discrediting testimony given by such witness, he may, if the witness proves hostile or has misled him by previous statements, by leading questions, call the attention of the witness to such previous contradictory statements; hence, where the state has called as a witness a daughter of defendant who was also the wife of deceased, it was not improper to question her as to the contradictory statements made while before the grand jury.

2. *Same.*—Where a witness was related to defendant, and was called by the state, and did not testify as the state had been led to expect that she would, it was competent to examine her as to her visits to defendant for the purpose of showing that she had recently come under his influence.

3. *Homicide; Evidence; Dying Declarations.*—Where, after having expressed a hope of recovery, deceased later stated that he was badly shot and would never get up from his bed, there was sufficient predicate for the admission of his statements relative to the difficulty as to a dying declaration.

4. *Same; Self-Serving Declaration.*—Where a few minutes after firing the fatal shot, defendant told a witness that he had killed deceased, but that he had to do it, such statement although a confession was not admissible for the defendant as it was a self-serving declaration.

5. *Same; Res Gestae.*—A statement made by defendant some minutes after he had fired the fatal shot, and after he had left the scene of the difficulty in which he explained that he had to kill deceased, was not admissible as part of the res gestae.

6. *Appeal and Error; Harmless Error; Evidence.*—Where a defendant testified to a statement made by himself, and the evidence was undisputed, it was not prejudicial error to decline to permit defendant to make such proof by other witnesses.

APPEAL from Coffee Circuit Court.

Heard before Hon. H. A. PEARCE.

Osband Hickman was convicted of manslaughter in the first degree, and he appeals. Affirmed.

The defendant was indicted for murder in the second degree for killing Asbury Rushing by shooting him with

a gun, and was convicted of manslaughter in the first degree. The deceased was the son-in-law of the defendant, having married the defendant's daughter "Bama," in August, 1913, who at the time of the trial deposed to being 18 years of age. The evidence shows that the deceased, with his wife, lived only a short distance from the residence of the defendant; that on the day the homicide was committed the deceased and the defendant had gone to town together, returning home late in the afternoon, and on arriving at the house of the deceased defendant invited deceased and Bama to accompany him to his home and take supper with him; that they accepted the invitation and went with the defendant. The evidence has tendencies going to show that both the deceased and the defendant were drinking. While deceased and his wife were in the kitchen at supper, the young sister of deceased's wife, Rosa Lee, a girl of 15, was there also engaged in her work about washing the dishes, and engaged in conversation with the deceased, and the deceased became boisterous and abusive toward the girl Rosa Lee; that Rosa Lee reported this to her father, who was in the front room with the other members of the family. As to what occurred after this, the evidence is conflicting; that on the part of the state tending to show that, soon after the girl Rosa Lee went into the room where the defendant was, defendant came out on the back porch bringing with him a gun, and called the deceased and "dared" him to go out of the kitchen into the yard, and that deceased and "Bama" went out in the yard together, and defendant "dared" him to come up on the steps, and that deceased stepped up on the steps and said to defendant that his (deceased's) wife was in no condition for him to have a fuss, and, "I'll take your dare and go back to Bama and go home," and, as deceased turned and started to go back to Bama, defendant

said: "God damn you! I'll shoot you anyhow"—and fired. That the charge from the gun passed through the wrist of the deceased and into his left hip just over his left hip pocket, and lodged in the "gluteus muscle," and the deceased fell backwards off the steps. The evidence on the part of defendant tended to show that, when the daughter Rosa Lee came into the room, he told her to go back into the kitchen and wash the dishes, that deceased would not bother her, and to pay no attention to him, and when she returned to the kitchen the defendant heard the deceased "railing at her" and tell her that he would burst her brains out with a cup. The defendant here testifies:

"Then I went to the door and called him; 'Asbury, don't you know that wont do? You know you are in my house.' And he replied with an oath, 'Yes, I do know that I am in your house, and I am going to kill you.' I heard the sound of scuffling in the kitchen like he was getting up, and I stepped back in my room and got my gun, and when I got back out there on the porch Asbury [the deceased] was coming out of the kitchen onto the kitchen porch with Bama holding to him, and she was holding on to him and begging him to go home, and I put in and told him. I said: 'Asbury, you go on home; I don't want to have any trouble with you.' And he got around to the edge of the door and struck at me with his knife, or I thought it was a knife. It just did touch my shoe enough for me to feel it. He was standing on the ground, and I was standing on the porch about the water shelf, and I stepped back toward the little room, and he started back, and his wife got hold of him, and they went out toward the corner of the house, and he jerked loose from her, saying, 'I am going to get him,' and then he ran up on the third step, or something like that, with his arm upraised in a striking position, and

then I shot him.  At the time I shot him, I was standing near the middle of the porch about 1½ or 2 feet from the top step.  I could not see well, and if he turned his left side to me as he came up the steps he turned just as the gun fired."

On redirect examination, the state's witness Bama Rushing was asked by the solicitor the following question:

"To refresh you, when you was there before the grand jury, did you not testify that when Asbury came out of the kitchen, and you and Asbury being out there in the yard, that your father came to the door and dared Asbury to come up on the porch?"

The defendant objected to the question, and the court overruled the objection; the defendant duly excepting. The witness answered, 'No, sir."

The solicitor then asked the witness:

"And did you not testify before the grand jury that Asbury started, and that he got up on the first step, and that then he turned and said, 'Bama is in no condition for me to have a difficulty, and I am going to her,' and that he then started to you, and then as he turned and started to you that your father shot him?"

Over the objection and exception of the defendant, the witness was permitted to answer the question, as follows:  "He said that before he ever run up on the steps."

The solicitor later asked a series of questions, and the witness answered as follows:

"(1) Q. How many times have you seen your father? A. I haven't seen him but once.  (2) Q. Haven't seen him but once?  A. But once.  (3) Q. When was it that you had the conversation with him?  A. I haven't had a conversation with him.  (4) Q. You were in the jail with him Sunday, weren't you? A. Yes, but I didn't have a conversation with him.  I had a few words with him.

(5) Q. How long did you stay there? A. About an hour and a half. (6) Q. You stayed there about an hour and a half? A. Yes, sir. (7) Q. Who did you talk to while you was there? A. I didn't talk to nobody. (8) Q. Was anybody else there besides you and your father? A. Yes, sir. (9) Q. Well, did you talk to your father any? A. I said a few words to him. (10) Q. Did you talk any about this case? A. No, sir; not a thing about this case. (11) Q. Nothing about the case at all? A. No, sir. (12) Q. Nothing about what you were going to testify? A. No, sir. (13) Q. Nor about what you had testified to before the grand jury? A. No, sir. (14) Q. Not at all? A. No. sir. (15) Q. Who else was down there when you went to see your father? A. My mother and brothers and sisters. (16) Q. Your mother, your brothers, your sisters, and you? A. Yes, sir. (17) Q. Did your father and mother, and brothers and sisters talk, or did any of them in your presence discuss the case? A. No, sir. (18) Q. You didn't talk about your father's case at all? A. No, sir. (19) Q. Nor about the trial of it? A. No, sir. (20) Q. Didn't talk about what the testimony would be at all? A. No, sir. (21) Q. Have you talked to anybody at all since you were before the grand jury, about this case? A. Nobody except Patrick Rushing. (22) Q. Nobody except Patrick Rushing, you say? A. Yes, sir. (23) Q. You haven't talked to any one else at all? A. Not as I remember of. (24) Q. Not that you remember of? A. No, sir. (25) Q. And you haven't told anybody what your testimony would be? A. No, sir."

W. W. SANDERS, for appellant.. The effect of the questions of solicitor to his witness was not to refresh her recollection within the rule laid down in the case of *White v. State,* 87 Ala. 24, but were clearly for the sole purpose and effect of impeaching the testimony of the

witness. It was also incompetent to show that since her testimony before the grand jury she had been on a visit to defendant on several occasions.—*Gandy v. State,* 81 Ala. 1; *Murphy v. State,* 32 A. & E. Ann. Cas. 1120. The declaration and explanation made by defendant as to why he killed deceased was so intimately connected with the killing in point of time and place as to be a part of the res gestæ.—*Stevens v. State,* 138 Ala. 71.

R. C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, for the State.

BROWN, J.—It is an ancient rule of the law that a party cannot directly impeach the character of his own witness for the purpose of discrediting testimony given by the witness and with which the party is dissatisfied. The reason for this rule, that seems to have stood the test of time and experience, is that when a party offers a witness in proof of his cause he thereby, in general, represents him to be worthy of belief, and will not be allowed to assume the inconsistent attitude of saying that he is unworthy of belief. This rule, however, is not violated, if the witness proves to be hostile to the proponent, or by previous statements made by the witness he has been deceived or misled, and is surprised and placed at a disadvantage by unexpected answers, by allowing leading questions calling to the attention of the witness previous contradictory statements, even though an affirmance of such previous statements may have a tendency to affect the credibility of the witness.—*White v. State,* 87 Ala. 26, 5 South. 829; *Hemingway v. Garth,* 51 Ala. 530; *Thomas v. State,* 117 Ala. 178, 23 South. 665; *Schieffelin v. Schieffelin,* 127 Ala. 35, 28 South. 687; *Southern Bell Telephone Co. v. Mayo,* 134 Ala. 645, 33 South. 16.

The witness Bama Rushing was the wife of the deceased and also the daughter of the defendant, and on her examination as a witness for the state testified, contrary to the state's theory of the case, that the deceased, after he had started home with witness, turned and said that he was going back and kill the defendant, and ran up the steps and struck at the defendant with his knife, and defendant shot him. Thereupon, in response to the question put by the solicitor, witness admitted that she had testified before the grand jury a few days before the trial and also admitted that she had had a conversation with the solicitor before she went on the stand. On this predicate the court, over the objection of the defendant, allowed the solicitor to ask the witness:

"Did you not testify, when you were before the grand jury, that Asbury (the deceased) started to your father and got on the steps, but that Asbury turned around and told your father that Bama (the witness) was in no condition for him to have a difficulty, and that he (deceased) then turned to go back to you, and that as he turned your father shot him?"

This question, under the rule above stated, was proper, and the court ruled correctly in allowing it.—*Lanier v. State,* 1 Ala. App. 31, 55 South. 1032; *Glenn v. State,* 157 Ala. 12, 47 South. 1034; *Thompson v. State,* 99 Ala. 173, 13 South. 753; *Billingslea v. State,* 85 Ala. 325, 5 South. 137.

Nor is the rule in such case violated by allowing the proponent to show by the witness that the witness has "recently been brought under the influence of the other party."

"The weight of authority," says Greenleaf, "seems in favor of permitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what

the party had reason to believe he would testify, or that the witness had recently been brought under the influence of the other party and has deceived the party calling him."—1 Greenl. Ev. § 444.

The above quotation from Greenleaf was cited with approval in *Campbell v. State,* 23 Ala. 77.

By a series of questions, the state was allowed to show that the witness Bama Rushing, on Sunday before the trial, went to the jail where her father was confined, with the other members of the family, and remained there one hour and a half; that witness and her father only spoke a few words, and nothing whatever was said about the case or what witness would testify on the trial. This evidence was admissible as having a tendency to show that the witness had recently been brought under the influence of the adverse party, and to strengthen the predicate that the witness was hostile to the state, and as justifying the leading questions allowed the state to offer this proof in laying the predicate, not for impeachment of the witness, but of showing hostility and surprise, and justifying leading questions embodying previous contrary statements to refresh the recollection and overcome lapses of memory possibly occasioned by the friendly relation of the witness with the defendant. The court kept within the rule already stated, and the appellant has no right to complain.

The predicate for the admission of the dying declaration showed that after the deceased had received a mortal gunshot wound, which subsequently produced his death, he first expressed belief that he would get well, but soon thereafter he expressed it as his belief that he would die from the wounds inflicted by the defendant. It was also shown that the deceased on the night he was shot, and after he had been carried home and placed on a bed, expressed himself thus: "I am shot and I am

shot bad, and I will never get up from there." And it was shown that immediately after making these statements he made the statement about the facts of the difficulty admitted as a dying declaration. The predicate was sufficient for the admission of this evidence.—*Gregory v. State,* 140 Ala. 16, 37 South. 259.

The defendant offered to prove by the state's witness Alf Sharpless, on cross-examination, that a short time after he heard the gun fire, the time being estimated by witness from two to four minutes, witness met the defendant coming in the direction of the house of the witness, at a point 100 yards away from defendant's house, the place of the killing, and when defendant met witness he said to witness, "I have shot Asbury, but I had to do it." While this statement was a confession as to an undisputed fact in the case, it was also a self-serving declaration by which defendant sought to justify his conduct, and was not admissible at his instance unless it was a part of the res gestæ.—Jones on Evidence, § 236; *Martin v. Williams,* 18 Ala. 190; *James v. State, infra,* 67 South. 773.

The declaration was made after the defendant had left the scene of the difficulty, and sufficient time had elapsed for thought, and for defendant to realize that he had committed a deed for which the law would call him to account, and was prima facie a retrospective narrative of a past occurrence, sufficiently removed in point of time and place to justify its exclusion. We entertain the opinion that it was not a part of the res gestæ of the shooting, and that the court ruled correctly.—*Holland v. State,* 162 Ala. 10, 50 South. 215; *Nelson v. State,* 130 Ala. 83, 30 South. 728; *Lundsford v. State,* 2 Ala. App. 38, 56 South. 89. This case is distinguishable from the cases of *Stevens v. State,* 138 Ala. 71, 35 South. 122, and *James v. State, infra,* 67 South. 773. In those cases,

the declaration held to be a part of the res gestæ was made immediately after the shot was fired, and at the exact spot where the rencounter occurred, and was an involuntary exclamation or declaration produced by the act.

The statement of the defendant to his daughter Rosa Lee, "Go back to the kitchen and wash up the dishes; he is not going to bother you; you just pay no attention to him"—made before the shooting, was testified to by the defendant without objection and was not disputed by any other evidence in the case, and, if this evidence was admissible at all, the defendant was not prejudiced by the rulings of the court refusing to allow defendant to prove this undisputed fact by other witnesses.

We find no prejudicial error in the record, and the judgment of the circuit court is affirmed.

Affirmed.