32 So.2d 227

**STALLINGS v. STATE.**

4 Div. 877.

Court of Appeals of Alabama.

June 19, 1945.

Rehearing Granted Dec. 4, 1945.

Rehearing Denied Jan. 15, 1946.

D. M. Powell and Powell & Hamilton, all of Greenville, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Mac Donald Gallion, Asst. Atty. Gen., for the State.

RICE, Judge.

Appellant, tried under an indictment charging him with the offense of murder in the first degree, was convicted of the offense of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for the term of ten years.

It was admitted that he shot with a shotgun—which we know to be a deadly weapon—and killed, one Lawrence Rogers. In view of this, we quote and adopt, as being in all respects applicable here, the portion of our opinion in the case of Coates v. State, 29 Ala.App. 616, 199 So. 830, as follows, to-wit:

"As we said in the opinion in the case of Grays v. State, 28 Ala.App. 394, 185 So. 191, we repeat, here: 'The evidence in this case is, without dispute, that the homicide was committed by the use of a deadly weapon. Where such is the case, the proof of the use of a deadly weapon raises the presumption of malice, and throws upon the defendant the burden of repelling the presumption, unless the evidence which proves the killing shows, also, that it was done without malice.'

"Or, as the Supreme Court said in the case of Cooley v. State, 233 Ala. 407, 171 So. 725, 727: 'Defendant's testimony admits an intentional killing with a deadly weapon. The burden was then upon him to prove * * * self-defense * * *. And, though the evidence of defendant may have been without dispute, its credibility was for the jury * * *. They were not bound to accept it as true * * *. Indeed, they might well have rejected it in their discretion. Since they did so, their verdict was well supported.'

"The above quotations, especially the one from Cooley v. State, which controls us (Code 1923, Sec. 7318 [now Code 1940, Title 13, Section 95]), seem conclusive of the [perhaps] principal question argued here by appellant's distinguished counsel as a reason for the reversal of the judgment of conviction."

A fortiori would the holding in the above quotations be true where, as here, defendant's testimony is stoutly and squarely disputed at every material point. And this disposes of some twenty-two pages, of the more than thirty-six, of appellant's able counsel's meticulously—well nigh tediously—prepared brief, filed here on this appeal. Both the general affirmative charge requested by appellant, and the motion to set aside the verdict on the ground it was opposed to the great weight of the evidence, were refused and denied without error.

But there are other matters we will notice, briefly.

As appellant's counsel writes: "The contention of the State was that the deceased, Lawrence Rogers, and his brother, James Rogers, passed the home of appellant's father after dark on the night of April 12th, 1944, going to a store about one-fourth of a mile beyond to get some tobacco; that the road they were travelling was close to the Stallings' home; that as they were passing by, Willie Stallings, appellant's father, hailed them and asked what they were doing cursing out there and that James Rogers replied, 'ain't nobody cursing.' After making this reply James Rogers testified that he and his brother, Lawrence, went on their way along the road toward the store; that after they had gone about sixty yards appellant's father called to them to wait a minute that he wanted to see if they had any liquor on them; that they kept on walking and then the gun fired and Lawrence Rogers, brother of James Rogers, fell; and that when he fell James Rogers turned around and faced appellant and his father, and the father said 'Guy I told you not to do that.' "

Appellant's counsel further writes: "Appellant's defense was that at the time of the difficulty the deceased made a felonious assault upon his father with an open knife;

and that he and his father were both free from fault in bringing on the difficulty and that he shot the deceased to save his father from death or grievous bodily harm."

It thus appears that by the statement of appellant's own distinguished counsel, the case was one peculiarly for the jury.

Our Supreme Court has said: "The general rule has been declared that the qualifications of a witness to testify as an expert is a matter largely within the discretion of the court trying the case, and the appellate court will not reverse its rulings unless there has been an abuse of that discretion; and Mr. Wigmore states that the exercise of the discretion in this particular should not be reviewed at all." Stewart v. Sloss-Sheffield Steel & Iron Co., 170 Ala. 544, 54 So. 48, 50, Ann.Cas. 1912D, 815.

Since the above is true (Code 1940, Title 13, Section 95), it would follow that it was likewise in the discretion of the trial court to allow the questions put to the witness Dr. C. J. Rehling seeking to further develop his qualifications as an expert witness. We observe no abuse of that discretion such as would call for any revisory action on our part. And appellant's objections to such questions were overruled without error.

We have carefully examined the rulings underlying the other exceptions reserved on the taking of testimony, but do not deem it worth while to discuss them separately. Able counsel here representing appellant argues for error, in an appealing manner. But is unable to cite any holding by this or the Supreme Court that, to our minds, sustains his argument.

As an illustrative instance he complains bitterly that it was error to refuse to allow appellant to tell what he said to his father, when he came into the father's house shortly before both he and his father went out into the highway, and down the highway some distance, to where the shooting occurred.

Manifestly, without being informed of what it was appellant proposed to tell, the court was authorized to sustain the objection to the question. It might have been something having no bearing whatever upon the difficulty then pending or impending between appellant and deceased. And, equally as clearly, we are unable to adjudge the trial court in error because of its said ruling.

As to every other ruling, on the taking of testimony, underlying an exception reserved, we state that, after a careful study, we are of the opinion and hold that it was either correct or innocuous.

Appellant's able counsel urges upon us the novel theory that "although the difficulty was in the road (public road), the defendant (appellant) and his father were on his father's premises,"—this because, as he argues,"the father owned the lands on both sides of the road and the difficulty occurred only about sixty-five yards from the father's front gate." And that hence his written requested charge 8 (which the reporter will set out in the report of this case) was erroneously refused. But we do not agree.

Neither this written charge 8, nor any other of the written, requested, and refused, charges were due to be given to the jury.

The argument of the Solicitor made the subject of an exception did not, in our opinion, transgress the rules which prevail. Cross v. State, 68 Ala. 476.

We have given the most earnest study to the record—aided thereto by the detailed and voluminous brief filed here on behalf of appellant. The argument contained therein, it would seem, might have won an acquittal before the jury.

But, as pointed out in similar detail in the brief filed here on behalf of the State, there is nothing for this court to do but affirm the judgment of conviction. And it is so ordered.

Affirmed.

### On Rehearing.

PER CURIAM.

Upon further consideration of all the facts in this case, and also the unusual and prejudicial manner in which the prosecution was conducted, we have reached the conclusion, and so hold, that error prevailed in the action of the court in overruling and denying defendant's motion for a new trial.

█ It affirmatively appears from the record that there was no dispute or conflict on the question that the defendant shot and killed the deceased with a single barrel 12 gauge shotgun loaded with small bird shot. It was also admitted that the wound upon deceased was in his face on the right hand side and that no other wounds were upon the body of the deceased. Defendant undertook, as he had the right to do, to justify the act complained of for that he fired the shot in defense of his own father who at the time was being murderously attacked by deceased who was armed with a large switch blade knife, and was in great danger of being killed, maimed or seriously injured by the deceased. (The switch blade knife above referred to was introduced in evidence and sent up for our inspection. By actual measurement it is 7 inches long.) In connection with such defense the defendant testified, and also offered other testimony tending to show, that at the time of the fatal shot his father was wholly free from fault by word or act, in provoking, or bringing on the difficulty and that on account of the suddenness and unlooked for attack his father had no reasonable mode of escape without greatly increasing his danger. Such defense as stated, is admissible under the law. 11 Alabama Digest, Homicide, ☜ 122.

█ The expression above, "unusual and prejudicial manner in which the prosecution was conducted," has reference principally to the so-called expert voluminous testimony which related solely to an undisputed fact, and about which there was no controversy. Expert testimony is permissible in some cases where the matters involved are in controversy, or highly technical, and are such that the jury cannot be assumed to be able to form a correct opinion of their own. But such testimony is not necessary or allowable unless the case involves a subject of special technical science of which the trier of the facts (the jury) is not presumed to be specially informed. The purpose of such testimony is to assist the jury in arriving at a conclusion. But expert testimony is not admissible on matters of common experience or understanding requiring no particular skill or fitness, and from which inferences of fact the jury are as capable of drawing and deciding as others. In other words, the rule is, that where a court or jury can make their own deductions, they shall not be made by those testifying. In all cases therefore where it is possible to inform the jury fully enough to enable them to dispense with the opinions or deductions of witnesses from things noticed by themselves or described by others such opinions or deductions should not be received. It needs no expert witness upon material matters of a trial where such matters are admitted and about which there is no semblance of controversy.

█ In this case the record discloses that the admitted killing of deceased by appellant happened on the 12th day of April 1944, and that several months thereafter, towit: On the 31st day of October 1944, the body of deceased was exhumed and an autopsy held by State witness, Dr. C. J. Rehling, who testified as an expert, and was permitted over the objection of the defendant to state to the jury all that he saw and did in this connection. All this in the absence of the defendant. He exhibited several pictures taken by him on that occasion. Said pictures, or photos, were of the locus which witness testified were pointed out to him, and of the body of deceased. From the record we quote a portion of the examination of this witness and his answers:

"A. We proceeded to the cemetery, for exhumation.

"Q. There, Doctor, did anyone point out the grave of Lawrence Rogers to you? A. Yes.

"Q. Who? A. Mr. Rogers, the father of the deceased.

"Q. Anyone else? A. Yes. The coroner and mortician.

"Q. Mr. Turner? A. Yes, sir.

"Q. Doctor, was the body exhumed at that time? A. It was.

"Q. Did you perform an autopsy on that body? A. Yes, sir.

"Q. An examination? A. Yes, sir.

"Q. Will you tell the jury the nature of the work there, Doctor—what you did. A. I examined the body for violence and

the evidence of violence was particularly centered about the face. The tissue of the body was badly decomposed but the skeleton structure was fairly intact. The entire right cheek area of the face was missing, including part of the right eye socket, a portion of the right nose structure and a portion of the upper tooth structure, with a hole there some two and a half inches in diameter, commonly described as a rat hole type of wound, and the shotgun charge with the wadding almost intact, was found in the upper mouth area, back against the spine in the section that corresponds to the soft palate and I got some shot, some stray pellets had scattered over the face so as to leave their markings on the upper right forehead area and the right ear area and down on the lower right chin. All of these pellets struck to the right of the median line of his face and there were no markings to the left side. The direction of fire of the charge was at an angle, angling roughly forty degrees or so from the median line of the face to the right, almost horizontally into the face. The skull was fractured over the right socket, right eye socket area up for a distance of about three and a half inches. The floor of the cranium or roof of the mouth was shattered; the spinal column, which constitutes the upper back portion of the mouth, was crushed; several of the upper jaw teeth were out and missing, the entire right jaw bone being missing from that point, and that cavity had been filled with mortician's cosmetics that I removed. There was no evidence of violence to the rear of the skull or to the neck.

"Q. In your judgment, based on your experience, what was that absence of flesh due to? A. The decayed flesh was over the face except these damaged portions which had been reconstructed by the mortician, but the decay damage was present over the balance of the face, so badly decayed you could not hardly recognize. * * *

"Q. I believe you said you found some wadding? A. Yes, sir.

"Q. Where did you find that? A. In the upper region of the posterior mouth.

"Q. Could you tell from that wadding the gauge of the gun that fired the shot? A. Yes, sir.

"Q. What was it? A. A 12 gauge.

"Q. Could you tell from your examination the size of the shot? A. I could only give an estimate on that due to the mutilated condition of the pellets of the charge. They were around Number six to number seven, but I can't say definitely.

"Q. Doctor, did you take any pictures there with respect to the line of fire? A. Yes, I took several.

"Q. Did you take any pictures, Doctor, that in your judgment would reflect the line of fire of the shot—?

"Mr. Powell: The undisputed evidence is that the man was shot on the right hand side of his head and I don't understand the purpose of going into all of this, if the court pleases.

"Q. Doctor, I show you this picture. (Hands witness picture) Will you take your pencil and point out to us—you took pictures of the body of Lawrence Rogers at the time of the exhumation or shortly after, didn't you. A. Yes, sir.

"Q. And from that examination you determined the facts you have just stated? A. Yes.

"Q. Doctor, what was the pattern of fire? A. The pattern of fire was primarily an intact charge in the middle of the pattern. Most of the pellets went in as a mass, as near a unit as it is possible. There were numbers of stray pellets around that gave an overall measurement of approximately five and one-half inches, from the forehead down to the lower pellet on the jaw bone.

"Q. Doctor, that was 12 guage waddings you found there, weren't they? A. Yes, sir.

"Q. Doctor, are you able from that your examination, that examination, and from your knowledge and experience to estimate the distance from which that gun was fired? A. Yes.

"Q. In your best judgment, what was the distance? A. Approximately ten feet or so.

"Q. Do you mean that distance from the muzzle of the gun or the butt? A. From the muzzle.

"Q. From the muzzle of the gun? A. Yes, sir.

"Q. Doctor, have you ever seen these clothes in this box before? A. Yes.

"Q. Did you receive them in this box? A. I did.

"Q. Do you know who sent them to you? A. The clerk. Isn't the label still on there? Mr. Taylor.

"Q. Do you know when you received this clothing? A. I received them yesterday at the laboratory in Auburn.

"Q. Have you made any analysis of these clothes? Yes. I examined the blood stains on the shirt particularly.

"Q. The blood stains? A. Yes.

"Q. What was the result of your analysis? A. Human blood.

"Q. It is unquestionably human blood? A. Yes."

The clothes worn by the deceased at the time he was killed, have also been certified to this court for inspection.

In the case of Boyette v. State, 215 Ala. 472, 110 So. 812, our Supreme Court (speaking through its Chief Justice Anderson) said:

"The trial court should not have permitted the introduction of the clothing of the deceased, as it shed no light whatever upon any material inquiry in the case, and was but the presentation of an unsightly spectacle calculated to prejudice the jury. There was no dispute as to the location of the wounds or the character of same on or about the head, and the bloody clothing of the deceased shed no light upon any controverted fact. The clothes worn by the deceased should never be offered in evidence unless they 'have some tendency to shed light upon some material inquiry.' Louisville & N. R. Co. v. Pearson, 97 Ala. [211], 219, 12 So. 176; Alabama G. S. R. Co. v. Bell, 200 Ala. 562, 76 So. 920; Rollings v. State, 160 Ala. 82, 49 So. 329; Crenshaw v. State, 207 Ala. 438, 93 So. 465."

In Blackburn v. State, 22 Ala.App. 561, 117 So. 614, this court said:

"Witness cannot give expert opinion as to relative attitude of deceased to instrument or person inflicting the fatal wound, since this is inference to be drawn from the facts, and is for the jury.

"In prosecution for murder, in which it appeared that deceased was shot in head and fell on floor of storehouse testimony of state's witnesses that, after body of deceased had been removed defendant took some sand and poured it over deceased's brains lying on the floor, stirred it around with his foot, then took it up in a shovel, and threw it across the street, held error. * * *

"The court should not have permitted this line of inquiry. The act of defendant, if true, was not a part of the res gestae, shed no light upon any material inquiry, and was but the presentation of an unsightly and gruesome spectacle calculated to prejudice the jury."

Without prolonging this discussion, we reiterate, from the facts of this case and the conduct of the trial aforesaid, we are clear to the conclusion that error prevailed in the action of the court in overruling and denying defendant's motion for a new trial. Judgment of affirmance set aside.

Application granted. Reversed and remanded.

HARWOOD, Judge, not sitting.