29 So.2d 431

### SUMMERS v. STATE.
### 6 Div. 377.

Court of Appeals of Alabama.
Feb. 11, 1947.

Rehearing Denied March 11, 1947.

J. C. Milner and Young & Young, all of Vernon, for appellant.

Wm. N. McQueen, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The indictment in this case charged the defendant with the offense of murder in the first degree. It contained eight counts, each of which in different phraseology charged said offense. The trial below resulted in the conviction of the accused of murder in the second degree and his punishment was fixed at imprisonment in the penitentiary for a period of twenty years. From the judgment of conviction duly pronounced and entered, this appeal was taken.

It clearly appears, from the transcript, the trial court complied with all necessary preliminary orders in strict accord with the requirements of the governing Statutes. No contention or insistence to the contrary is presented.

It is conceded by respective parties, and also affirmatively appears from the evidence, that the conviction in this case rested entirely upon circumstantial evidence. Such being the case we feel it incumbent to incorporate here a full statement of the facts, as appears from the transcript.

As stated, the evidence in this case is entirely circumstantial. It appears that deceased person, Austin Pinkerton, was last seen alive upon the morning of July 15, 1945; as he departed from his neighbor's home going in the direction of his own home. His body was found upon the afternoon of July 18, 1945, in an old well located in an uninhabited section of the community. The body when found bore evidence of a shotgun wound in the shoulder and of two blows having been struck about the head of the deceased with some instrument, fracturing the skull of the deceased. The condition of the body as to decomposition showed, that in all probability, the deceased had been dead since the day of his disappearance. From the condition of the body, the skin of the deceased, and the clothing upon the body, it appeared that the body had been immersed in water for some length of time prior to its deposit in the well, which was dry. It is shown that the deceased, upon his departure from his home upon the day of his disappearance, had in his possession $100 to $125. No money was found upon the body of the deceased when discovered in the well.

The testimony introduced by the State tends to show the following chain of circumstances associating and connecting the defendant with the death of the deceased and indicating his guilt thereof.

Upon the afternoon of July 19, while a party of neighbors and other persons were continuing the search for clues as to the identity of the slayer of Austin Pinkerton, there was discovered upon the property of the defendant, some 75 yards from his house, a discolored spot upon the ground having the appearance of blood. Numerous witnesses testified to the odor of a corpse surrounding this spot and the presence of green flies around this discoloration. A portion of this discolored earth was taken by the County Solicitor and forwarded to the State Toxicologist who in turn forwarded it to the State representative for analysis. The State representative (Brooks) testified that his analysis definitely shows said discoloration to be blood but from his tests he was unable to definitely distinguish whether it be human or animal blood.

The State also introduced testimony showing that within a short distance of this spot of discoloration, in a small stream running nearby, a spot was found which showed evidence of a body, or some inanimate object, having been lowered down the bank of the small stream and having lain in a small pool of water upon or against the bank. This was also upon the property of the defendant, near his home.

Other State witnesses testify to taking a pair of shoes, which the defendant admitted to be his, and which were found in his home, and that they compared tracks found upon the bank of the small stream where the sign mentioned above was found and tracks found at the well where the body was discovered, and that the shoes of the defendant fit in the tracks so discovered. Two State witnesses, Sam McLemore and Murray Gosa, testified that using the shoes of the defendant they successfully followed a trail leading from near the spot where the small pool of water was located to the well where the body was discovered and back to a point near the home of the defendant.

There is also evidence tending to show that upon the day of the disappearance of the deceased a shot was heard in the vicinity of the defendant's home. Also that two shotguns were found in the home of the defendant, both with broken stocks, one freshly broken, and that one of the guns had the odor of having been recently fired.

It is apparent from the evidence that it is the theory of the State that the deceased was murdered by being shot and beaten over the head; that the body was concealed in the small pool of water in the stream running near the defendant's house, where sign of such was discovered, thereby causing the body to give the appearance of having been immersed in water at the time it was discovered in the dry well; that at some time later the body was removed from the stream and carried to and deposited in the old well. It is the contention of the State that the tracks left by such person indicate it to have been the defendant who performed these acts.

The defendant testifies in his own behalf professing ignorance of any knowledge of the events surrounding the slaying of the

deceased. He testifies that he knew nothing of the discolored spot on the ground near his home nor did he have any knowledge of, nor take any part in, the depositing of the body of the deceased in the well where it was discovered. He further accounts for his presence and his activities during the period of the disappearance of the deceased and the subsequent discovery of his body showing that during this time he followed his normal routine of daily life and did not flee from the neighborhood. In this he is corroborated by other witnesses.

The foregoing statement of facts have, in the main, been quoted from the State's brief filed in this case.

We deem it proper also to set out the "statement of facts" contained in the briefs of distinguished counsel for appellant. To wit:

"On or about July 15, 1945, Austin Pinkerton lost his life in Lamar County, Alabama. On July 18, 1945, he was found in the bottom of a dry abandoned well about two miles from his home.

"Austin Pinkerton left his home about 7:30 A.M., July 15, 1945. According to Ernest Nolen the deceased arrived at his home about 8:00 A.M., remained there for about one hour, and then left Nolen's home going in the direction of his own home. In so far as has been shown by the testimony in this case, he was not again seen alive. General search was organized in that community, and several hundred persons participated in a search for the body of Austin Pinkerton. The body of the deceased was found about 2:30 P.M., July 18, 1945 in an old abandoned well surrounded by vines and bushes in an unhabited region in the general community in which deceased lived. Pinkerton was buried on Thursday and on Friday, defendant was arrested and charged with his murder.

"The State based its case on the following facts: On Thursday, July 19, 1945, after funeral of deceased about 100 neighbors and law enforcement officials again searched the area adjacent to the well. It was established that the well was about one mile from the home of defendant and that all of this distance was made up of wooded areas and grown-up abandoned fields. Some of the members of the searching party found

a stain on the ground about 80 yards north of the home of defendant, such stain being darkish red in color and having an odor characterized as 'smelling like a dead person.' After discovery of this stain, the house of defendant was searched and a pair of shoes without heels on them was found inside, together with two shotguns, both of which had broken stocks. The stock of one undisputedly had been broken for some length of time. Testimony concerning the broken stock on the second gun varied from 'fresh broke' to broken for years. Other members of the searching party were alleged to have taken the shoes without heels, and by using such shoes 'back-tracked' from defendant's house to the well in which deceased was found. It was admitted by persons testifying that they had followed these tracks, that the approximately one mile from defendant's house to the well in which deceased was found was covered by sage grass, undergrowth and woods, all of which were in rank mid-summer growth; further, that none of them had ever had any experience in tracking, and that several hundred persons had been milling around in the woods prior to the time the tracking was supposed to have taken place. It was also stated that in a small branch just below the place where the dark stain was discovered on the ground, that there was a spot in which it appeared that some object had lain in the water and against the bank. No testimony was introduced to identify this object with any degree of certainty. Samples of the stain found on the ground near defendant's home were collected by the County Solicitor and forwarded to the State Toxicologist in three separate containers, with contents of two of the containers being soil, and the other leaves and twigs. A representative of the State Toxicologist's Office testified that the soil in one carton and the twigs and leaves in another under chemical analysis showed positive reaction for blood, although it was not possible for them to determine whether or not the blood was animal or human; further, that their office did not run any tests for animal blood, but that their tests were all for human blood, and they received no positive reaction. A local doctor testified that he examined the body of the deceased directly after it was re-

moved from the well, and it had two wounds on it, one being in the right shoulder and the other in the head; that in his opinion the wound in the head was the cause of death, and that it was probably caused by some blunt instrument. A representative of the State Toxicologist's Office testified that in October, 1945, he performed an autopsy on the deceased's body, this being some three months after death, and that in his opinion, the wound on the right shoulder was the cause of death; that such wound was a gunshot wound, and that pellets from a shotgun charge were found in this wound, such shots or pellets being size 6½.

"No testimony was introduced by the State indicating that deceased went to defendant's house on the day that he disappeared, or that deceased and defendant were seen in the company of each other at, or near the time of deceased's disappearance, or that any ill feeling existed between defendant or deceased."

At the close of the testimony counsel for appellant took the position that the evidence adduced upon the trial was insufficient to warrant the conviction of the defendant of any offense comprehended in the indictment; and presented this insistence to the trial court in every conceivable manner. Upon this appeal, this same contention is renewed, and this point of decision is the principal question for review to effect a reversal of the judgment of conviction from which the appeal was taken.

■ The measure of proof in a criminal case in order to convict, whether such evidence is direct, or circumstantial, is, that the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. No greater degree of certainty in proof is required where the evidence is all circumstantial than where it is direct for, as stated, in either case the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. They are bound by their oath to render a verdict upon all the evidence, and the law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of the fact may be inferred.

In the case at bar, the corpus delicti was conclusively proven, without dispute or conflict. Therefore, the vital and controlling question is, did the defendant commit the crime complained of in the indictment. This is the only controversial question in this case.

■ We have hereinabove set out practically all of the material evidence as to the facts of this case as disclosed in the transcript. We have carefully studied these facts and have given all of them our most careful and attentive consideration. Our conclusion is we would not be justified in substituting ourselves (this court) for the trial judge and jury who tried this case below. So far as we can ascertain, the learned trial judge was careful to allow the accused every opportunity, and all latitude to make out his defense, and was fair and impartial throughout the entire trial. No error of a prejudicial nature appears in any of the court's rulings. We are of the opinion that the evidence tended to show too many incriminatory acts and conduct of the defendant tending to show his guilt, for this court to declare error in the trial court's rulings, wherein he overruled and denied defendant's motion to be discharged; likewise no error prevailed in the action of the court in refusing to defendant the affirmative charge, nor in overruling and denying his motion for a new trial.

It follows that the judgment of conviction from which this appeal was taken is due to be affirmed. It is so ordered.

Affirmed.