78 So.2d 293

**Tom GIPSON**

v.

**STATE of Alabama.**

4 Div. 802.

Supreme Court of Alabama.

Feb. 24, 1955.

230

W. Perry Calhoun, Dothan, for appellant.

Wm. H. Sanders, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant, Tom Gipson, was tried and convicted of murder in the second degree

for the killing of E. C. Dyson, and was sentenced to twenty-five years in the penitentiary.

E. C. Dyson, the twenty-three year old deceased, his brother James, James' wife, their mother and father, another brother Travis and his wife (who was the daughter of Tom Gipson), all lived together about three miles from Columbia. On Sunday morning, December 20, 1953, James Dyson, E. C. Dyson and Charlie Brackin went to the home of defendant, Tom Gipson, who had a son by the name of Lester Gipson. Later James, E. C., Lester and Charlie left. While away E. C. and Lester had a fight, either at the Dyson home or in the automobile, as to which the evidence is not clear. They brought Lester back to defendant's home. James took E. C. home and put him on the bed because of his drunken condition. James then got his wife and carried her to another brother's house where they all spent the night, leaving E. C. alone and drunk lying on the bed at the house where they all lived. They all left the house on account of E. C. being drunk and because their mother had a bad heart. James, his wife and mother went back home the next morning and found E. C. lying on the bed in the same place with a bullet hole in his forehead and blood on the pillow which had flowed from the wound. There was no blood on the floor or elsewhere in the room, except on the pillow. The furniture was disarranged and glass and knives, which had fallen from a chifforobe, were scattered all over the floor: all of which was done by E. C. while drunk on that Sunday afternoon before James left, according to his testimony. There was no weapon of any kind except a folded knife was on the dresser.

The officers and investigators came before the body was moved. A silver colored .22 caliber cartridge shell was picked up on the right side of the house and another almost in front of the door and a brass colored one was found in the room at the foot of the bed. These were .22 caliber empty rifle shells. There was a hole (not fresh) in the wall above where the body lay, and to the right of the door of the entrance on the inside of the room. This hole was opened but nothing was found.

When defendant was arrested about 1:00 o'clock that day, he had a .22 rifle hanging on the wall of the front room of his house, and that afternoon he delivered it to Mr. Sowell, the toxicologist.

Defendant told the officer at another time that E. C. Dyson had whipped his daughter (Travis' wife) the day before and run her off from home and had beat up his boy Lester.

The evidence indicated that there was no hole in the screen door to the entrance of the house.

Dr. Sowell, the toxicologist, testified that, in his opinion, when the bullet hit the victim, he was knocked backward and fell backward on the bed. Also that, in his opinion, it would not have been possible for E. C. Dyson to have been shot at that door while standing up and to then turn and walk back and get on the bed. He further testified as follows:

"On the right side of the head, just in front of the right ear and just in back of the bullet hole in the skull, the skull was fractured. A piece of skull approximately one inch long, on the front side and one half to three quarters inches on the back side, was broken loose completely from the rest of the skull; a fracture ran upward from that injury across the midline and into the left choroidal bone, ending up just above the left ear. Another fracture ranged downward and inward, just back of the eyes, across the floor of the skull. The floor of the skull was fractured and several bone fractures ran out from the or several small fractures ranged from the lower portion of the fracture just in front of the right ear. The underside of the scalp, over the fracture, just in front of the right ear, was hemorrhagic over an area ¾ of an inch wide and 2 inches long. Now, right on top of the head, in the corner of the head, there was another hemorrhagic area on the under-

232

side of the scalp, approximately 2 inches long and ¾ inches wide.

"Q. In your judgment and opinion, as an expert, what caused those hemorrhagic areas on the scalp and in the skull and those fractures to that skull?

"Mr. Farmer: We object.

"The Court: Overrule the objection.

"Mr. Farmer: We except.

"A. The injuries were caused by external force or blow being applied to the scalp or head.

"Q. Were those injuries different from the one caused by the bullet wound? A. They were, yes, sir.

"Q. Could you determine from your examination of that man's body whether or not the bullet wound was inflicted first or the other wound inflicted first?

"Mr. Farmer: We object.

"The Court: Overrule objection.

"Mr. Farmer: We except.

"A. The other wounds were inflicted first.

"Q. How did you arrive at that finding? A. From the degree of hemorrhage in the scalp. The heart has to be beating to produce a hemorrhage or a hemorrhagic area, which is just a bruise, just like you hit your hand you have a black area or dark area in your hand. A hemorrhage is the breaking of small capillary blood vessels in the tissues and the blood leaving the vessels and going out into the tissue, from the broken vessels.

"Q. Now, in your opinion, could any person having the injuries to the scalp and skull and fractures that you found in this man, have been conscious at the time or immediately after they were inflicted?

"Mr. Farmer: We object, Your Honor.

"The Court: Overrule the objection.

"Mr. Farmer: We except.

"A. It is my opinion that he would not have been conscious. He would have been unconscious immediately.

"Q. From those blows being inflicted, would he have been immediately and instantaneously been immobilized, where he could not have walked around on his own violition?

"Mr. Farmer: I object.

"The Court: Did you ask him if it was his opinion?

"Q. Is that your opinion?

"Mr. Farmer: I object.

"The Court: Overrule the objection. Give him the benefit of the record.

"Mr. Farmer: We except.

"A. Yes, sir, that is my opinion."

The defendant testified in his own behalf that on that Sunday morning, his son Lester left his home with James and E. C. Dyson. After they had gone Horace Dyson, Hanley Spann and Abb Brackin came to his house. Horace told him that they were taking his son off to beat and cut him up, and that E. C. had taken a plank and beat up his daughter, and run her and defendant's son-in-law off from home. Defendant testified, "We got in the car about nine o'clock that morning and hunted and rode until around four o'clock that evening trying to find them. We couldn't find them; found several places that they had been to but couldn't get up with, until I got back home", where he found his son who told him E. C. Dyson had beat him up. He further testified that, knowing they were drunk, he took his rifle and went over to the Dyson home: what he did when he reached there is stated as follows: "I got up, walked up, had my rifle under my arm like this, knocked, stepped back off the edge of the porch like this, about six feet from there; he came to the door and threw a gun in my face, when he done that I darted over just like that. He fired twice at me and burned the hair on the said (side) of

my head right there; I threw up my rifle like that and shot at the man's face * * the man's face that was shooting there at me. Whoever it was, when he come to the door, he come stooped over like this, pulled the door open and threw the gun in my face, shot at me twice. I threw my rifle up, didn't take any aim or anything. He shut the door * * *." That the screen door was propped back with a chair, (he) "slammed the door to. When I fired my gun, I hit it just like that, just quick as a man could do it. I ejected the shell out of my gun and started to put another one in and he slammed the door, I turned around and walked off." Defendant testified that he was using white metal shells in his rifle, and he identified one shell as the kind he was using—a white one, not a brass one.

We have examined the record carefully and find that the questions discussed in appellant's brief are the only ones to which we need refer, and most of them do not need discussion.

█ A charge analogous to refused charge 2 was held to be good in the case of Elmore v. State, 92 Ala. 51, 9 So. 600. But in Daniels v. State, 243 Ala. 675(19), 683, 11 So.2d 756, it is said that it is but another way of charging on reasonable doubt and this was fully and fairly covered by the oral charge and its refusal was not reversible error. And so that observation is pertinent in the instant case.

█ Refused charge 8 pretermits a consideration of the elements of self-defense other than those referred to in it, and implies that defendant was entitled to an acquittal if he shot deceased in a bona fide and well founded belief that his own life was in danger. It leaves out the question of freedom from fault and of retreat. The charge referred to in Glass v. State, 201 Ala. 441, 78 So. 819, cited by appellant, contained the elements of self-defense which are omitted in charge 8, supra. Moreover, the principle sought to be invoked was fully covered by the court's oral charge.

█ Charge 9, refused to appellant, has been held by this Court to be properly refused. Russo v. State, 236 Ala. 155(4), 181

So. 502. Appellant's counsel cites Walker v. State, 153 Ala. 31, 45 So. 640; but that case was overruled by the case of Ex parte Davis, 184 Ala. 26, 63 So. 1010, which has been followed in many cases as pointed out in the Russo case, supra.

█ Refused charge 11 refers to "every element of self-defense," without specifying them. The court in his oral charge fully and correctly instructed the jury with reference to every element of self-defense. The same comment is applicable to charge 10.

There were several objections made by defendant to evidence. Most of them are of such nature as not to require comment; but we think some of them should be discussed.

The State, as indicated above, introduced as its witness W. L. Sowell, who was shown to be the assistant state toxicologist, and who qualified as an expert in ballistics. He testified that he had been working with the department of ballistics since March 15, 1945, and that he had worked approximately three to four thousand cases of ballistics. That means, as he testified, that he had fired and examined bullets discharged from guns in three to four thousand cases since he has been with the department of toxicology. He made an autopsy on the body of E. C. Dyson. He explained in detail the finding of a .22 caliber bullet which he took out of the head of the deceased, its exact location as to where it rested and where it entered; and the kind of pathway it made through the brain. This bullet was in evidence. He testified he received a rifle shown to belong to defendant. He shot that rifle so as to recoup the bullet and so that it retained its markings. That the markings on the bullet which came out of the head of the deceased were sufficient to determine what gun fired it; and that it was fired out of defendant's rifle. He explained fully his procedure in arriving at that conclusion. He also testified that the *brass colored cartridge shell was fired with defendant's rifle:* that the two silver colored shells were not fired with that rifle. He also testified with reference to the hole in the wall. It was a celotex wall. The surface around the hole

was cut out of the wall; and the inside pieces that were pushed through were covered with dust and spider webs showing, as he said, it had been done "for quite some time." On cross examination by defendant, the witness testified that the hole was about the size made by a .32 or .38 caliber pistol cartridge. He also testified as to the amount of blood on deceased's clothes and on the bed. (There was no blood elsewhere in the room.) All of which indicated to the witness that deceased had lived not over twenty minutes after being shot. Blood is forced out by the pumping of the heart, and he did not bleed after he was dead.

On re-direct examination witness was asked (in your experience as indicated) what in your opinion happened to E. C. Dyson when that bullet you found in his head struck his brain? His answer was, "It is my opinion, that when the bullet hit the victim, that the victim was knocked backward and fell backward onto the bed". And also, "I believe that he was unconscious at the time (from the time) he was shot. * * * He could have been knocked unconscious immediately." A question was also asked by the solicitor if he could state "as an expert, from your experience in the investigation of the death cases from gunshot wounds through the brain, if it would have been possible for E. C. Dyson to have been shot at that door while standing up, then turn and walk back and get on that bed?" The witness answered in substance that he did not believe he could have done so.

There was objection to each aspect of that testimony separately. All were overruled and exceptions noted.

We are therefore confronted with the problem as to what sort of evidence an expert can give in respect to matters within the range of his specialty. And, particularly, can he express an opinion that when the bullet hit the victim he was knocked backward and fell backward on the bed. He could undoubtedly express the opinion as an expert that the wound, occurring as it did, would tend to cause the victim to be knocked backward, and if on the bed or

near it to fall back on it. But can he express the opinion that it did that very thing?

There has been much difficulty in making a consistent application of what is called the opinion rule, rejecting evidence by an expert expressive of his opinion under certain circumstances. In Pope v. State, 174 Ala. 63, 78, 57 So. 245, the Court referred to the difficulty of a consistent application of this rule. A reference to our cases magnifies the thought. Louisville & Nashville R. Co. v. Elliott, 166 Ala. 419, 52 So. 28; Birmingham, Ensley & Bessemer R. Co. v. Williams, 190 Ala. 53(6), 66 So. 653; American National Ins. Co. v. Rosebrough, 207 Ala. 538, 93 So. 502; Equitable Life Assur. Soc. of United States v. Davis, 231 Ala. 261, 164 So. 86; Armour & Co. v. Cartledge, 234 Ala. 644(22 and 23), 176 So. 334; Colvin v. State, 247 Ala. 55, 22 So.2d 548.

We think the opinion of the expert in such matters as when the bullet hit the victim that he was knocked backward and fell backward on the bed, did not come within the rule of exclusion in respect to such matters. He could testify to the principle that when a bullet hits a victim, coming from directly in front, it knocks him backward and if a bed is there and he is found lying on it with such a bullet wound, that the victim fell backward on the bed. It is but the expression of the result of an accumulation of circumstances of which he has expert knowledge.

The case of Crawford v. State, Ala., 78 So.2d 291 [1], is being considered by this Court on rehearing along with the instant case. The Court is of the opinion that the Crawford case is an application of the principle to a situation which has been approved because it does not call for the opinion of an expert based upon expert knowledge, and it is not inconsistent with the holding in this case that there was no error in admitting the evidence.

Other features of the testimony to which objection was made in this connection were clearly admissible. We think there was no error in respect to the rulings referred to.

[1]. Ante, p. 191.

There was no error in the admission of the pictures of the decedent taken while he was lying on the bed after he was shot, and before he was moved: nor of the picture of the room when he was first found dead, showing the disarrangement of the furniture and effects scattered about it. Grissett v. State, 241 Ala. 343, 2 So.2d 399. That case also sustains the ruling of the court in respect to the testimony of the expert that the bullet and a certain shell were shot out of the rifle identified as belonging to defendant.

We do not find reversible error in any of the rulings by the trial court. The record shows a compliance with all the requirements and safeguards of the law in such cases. It therefore results that the judgment should be affirmed.

The foregoing opinion was prepared by FOSTER, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Affirmed.

All the Justices concur.