100 So.2d 725

**Homer D. ELLIS**

v.

**STATE.**

**7 Div. 397.**

Court of Appeals of Alabama.

Oct. 13, 1957.

Rehearing Denied Nov. 26, 1957.

Wales W. Wallace, Jr., Columbiana, for appellant.

John Patterson, Atty. Gen., Bernard F. Sykes and Jas. W. Webb, Asst. Attys. Gen., for the State.

PRICE, Judge.

The indictment charged murder in the second degree. Appellant was convicted of manslaughter in the first degree. Punish-ment was fixed at imprisonment in the penitentiary for a term of ten years.

The evidence for the State tends to show that a bullet fired from a .32 calibre automatic pistol belonging to defendant killed Peggy Joyce Williams on the night of November 18, 1954.

Mr. Van Ledbetter, a deputy sheriff, testified that shortly after 10 o'clock on the night in question he went to defendant's home, situated in a wooded section three quarters of a mile from the Genery's Gap road in Shelby County. There were two dwellings fifty or seventy-five yards apart. Mr. J. W. Hill lived in one, defendant in the other. Defendant was at Mr. Hill's home when the officer arrived. At defendant's home he saw deceased in a chair in the kitchen near a small table, with feet crossed and hands in her lap. There was a wound in her right temple. Her head was lying to the left and under it was a pan of blood. There was a pistol on the table. Just inside the living room door, adjoining the kitchen, there was a telephone on a stool with a chair beside it. There were some blood stains on the chair and on the floor near the telephone. Drops of blood led from the telephone to the chair in which deceased was sitting. The wire to the "ear phone" of the telephone was cut. A knife with a seven or eight inch blade was sticking in the floor. A rifle was on the living room floor. The bed appeared to have been slept in and the sofa had a blanket on it. The defendant was in a drunken condition. After proper predicate, the witness stated that defendant said, "* * * him and his wife had separated and he had wrecked his car, he had a new Oldsmobile 88, and this lady, he said he told her he was going to kill himself and get out of it, * * * and she reached for the gun and it went off." This was said in the presence of witness and Mr. Hill. Mr. Hill has since died.

Mr. Tom Fore, a deputy sheriff, testified, after proper predicate, that he heard de-

fendant give this version of the shooting on the night deceased was killed:

"Mr. Ellis said that his wife had deserted him some time before and he had wrecked his Oldsmobile automobile, I believe it was an Oldsmobile, some few days before this happened and he was worried and he had picked this girl up and they were out drinking and riding around; they had been out to his home and they continued to drink for some time and she had got pretty full and I believe he said he put her on the bed or couch in the middle room and covered her up with a blanket or overcoat or something and she wouldn't stay there and they got to arguing back and forth; he wanted her to stay with him and she wanted to leave and go home; he was insisting she stay with him and he said, he was so worried and upset over having wrecked his automobile and his wife leaving him and she was going to leave he was going to kill himself and he got the gun and attempted to do that, and she grabbed the gun and it discharged and killed her."

Defendant was drunk at the time he made the statement.

Mr. G. H. Fore, chief deputy sheriff, testified he went to defendant's home next morning. His brother, Tom Fore, gave him a pistol, which he turned over to Mr. Brooks. There was blood, flesh and hair on the outside and inside of the barrel.

Mr. C. D. Brooks, assistant State Toxicologist, having qualified as an expert in the field of forensic ballistics, testified he examined the body the day following the shooting. The bullet entrance wound was on the right temple, the exit wound behind the left ear. He gave a detailed description of the entrance wound, and testified it was his judgment, based on experience and observation, that the gun muzzle was in contact with the flesh at the time it was discharged. He stated there were powder stains and flame burns on the inside surface of the wound and around the bone, but no noticeable burns on the outside of the skin; that the recoil from a pistol of this type has a tendency to pull the pistol from the flesh and leave powder burns on the exterior of the wound; that a definite pressure of the muzzle against the flesh would overcome the tendency to recoil.

For the defendant, several witnesses testified to his good general reputation in the community where he lived and at his place of employment.

Defendant's mother testified deceased and defendant came to her home on the morning of the 18th of November, 1954. Both had been drinking. A pistol previously borrowed by defendant's father was returned to defendant. Deceased put it in her purse.

Defendant's two sisters and a brother-in-law testified defendant was drunk and his speech incoherent when they reached his home shortly after the shooting. The officers permitted them to take defendant home with them and place him under a doctor's care.

Defendant testified he had known deceased a little more than a week. On the morning of the 18th of November she asked him to drive her to Birmingham to look for work. They first drank a pint of "white" whiskey at her home, then went to his parents' home. His father told him he was going out of the produce business and had no further need for the pistol. Defendant took the clip out for safety purposes and deceased dropped the pistol and clip in her purse. After leaving his parents' home they bought two pints of whiskey at Homewood and started toward his home in Shelby County, drinking along the way. They bought two pints of white whiskey from a bootlegger. They reached defendant's home late in the afternoon. About 5 o'clock defendant tried to work on a garage he was building, but was too drunk. After taking several more drinks deceased opened some canned goods and they ate. He watched television in the living room, and deceased

began to make telephone calls, inviting people to come to defendant's for a party. Before making the calls she had suggested they go to a honky-tonk, but he refused because he was too drunk to drive. She said nothing about wanting to go home. Her loud talking and laughing on the telephone interfered with the television program and he asked her to take the telephone to the kitchen. She made one call from the kitchen, then came back to the living room to dial another number. This time she became so loud and boisterous in the telephone conversation he cut the wire with a butcher knife. There was no argument over his cutting the wire and he asked her to bring him another drink. She left the room and in a little while called to him from outside the house. She was in a drunken stupor and he helped her inside and placed her on the living room couch, covering her with a blanket. In a little while he saw smoke rising from the couch. After putting out the fire he accused her of starting the fire with a cigarette. She denied it with an oath, however no argument resulted because of this incident. Afterwards deceased left the house and defendant continued to watch television. Soon deceased returned with a glass of milk she had obtained from his neighbor, Mr. Hill.

The next thing defendant remembered was that he was standing in the doorway or in the middle of the room. He heard the shot and turned to see deceased slumping into a chair. He called to her, and receiving no answer, concluded she was dead, and he ran to Mr. Hill's residence.

He did not recall making a statement and remembered none of the people who testified to such statements. He stated there were no arguments between him and deceased; that he never saw the pistol after she put it in her purse. He denied placing the pistol on the table after the shooting. He denied touching the body and could not explain its position. He denied placing the pistol against her head and stated he did not see deceased put the pistol against her head. His explanation for the dish pan beneath her head was his habit of leaving a pan of water on the hot plate to be heated for dish washing. He put the rifle on the floor because he intended to clean it that night so he could go hunting with his brother-in-law.

Counsel states in brief:

"There was no testimony from any source tending to show that the defendant had any motive for killing the deceased, Peggy Joyce Williams. Through Judge Simpson in Anderson v. State, 30 Ala.App. 364, 6 So.2d 29 * * * the Court stated as follows:

"The law declares that a conviction upon circumstantial evidence cannot be sustained, unless, to a moral certainty, it excludes every other reasonable hypothesis than that of the guilt of the accused.

"Clearly the testimony in this case could not be said to exclude every reasonable hypothesis of innocence of the accused. On the contrary, the undisputed evidence is entirely consistent with the innocence of the defendant."

In Stone v. State, 105 Ala. 60, 17 So. 114, 117, the court said:

"Proof of motive is not essential to conviction in any case, nor can it be said in any case that absence of such proof is ground for acquittal. * * * Crimes may be, and frequently are, thoroughly established without any evidence of motive, and the very absence of motive may aggravate the offense."

In Summers v. State, 32 Ala.App. 657, 29 So.2d 431, 434, Judge Bricken said:

"The measure of proof in a criminal case in order to convict, whether such evidence is direct, or circumstantial, is, that the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. No greater degree of certainty in proof is required where the evidence is all circumstantial than where it is

direct for, as stated, in either case the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. They are bound by their oath to render a verdict upon all the evidence, and the law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of the fact may be inferred."

The evidence presented questions for the determination of the jury, and was sufficient, if believed, to sustain the judgment of conviction. There was no error in refusing to give the affirmative charge or in overruling the motion for a new trial predicated on the weight of the evidence. Blue v. State, 246 Ala. 73, 19 So.2d 11; Russo v. State, 236 Ala. 155, 181 So. 502; Ducett v. State, 186 Ala. 34, 65 So. 351.

■ Appellant insists the court erred in allowing Mrs. Mildred Ingram, a State witness, to testify in rebuttal that she talked with deceased on the telephone about 5:00 p. m., and that on that occasion deceased did not talk as though she were intoxicated; that in the conversation deceased "asked me what I was doing and I told her, cooking and she asked me what I was cooking and she told me she was coming over and eat supper with me and I told her to bring a bottle of catsup, and that was all."

The defendant's objections to the questions eliciting this testimony were based on the general grounds, hearsay and remoteness from the occurrence for which defendant was on trial.

The court stated that the testimony was admitted on the theory that it was in rebuttal.

Counsel argues in brief that "defense of defendant was predicated upon the theory that the deceased took her own life either through design or inadvertence and the intoxication of the deceased was a material issue and the court erred in allowing the unauthorized conclusion of the witness," and that the testimony as to what was said by deceased was hearsay and prejudicial because the "Solicitor from time to time unsuccessfully attempted to inject into the trial on cross examining the defendant that the deceased intended to leave the defendant's house and that trouble ensued over the defendant's failure to allow her to go."

We are of the opinion if there was technical error in the admission of this testimony, which we do not decide, it was not prejudicial error. Supreme Court Rule 45, Code 1940, Title 7 Appendix.

■ The record shows the following on the direct examination of Mr. Brooks:

"Q. Sometimes does the recoil from a pistol of this type when fired have a tendency to pull—when fired does it have a tendency to pull the pistol from the flesh of a person to where powder would be left on the exterior of the wound?

"By Mr. Ellis: You mean from the flesh?

"By Mr. Fowler: Yes, sir.

"By Mr. Ellis: We object on the grounds it is incompetent, irrelevant, immaterial and illegal; there is no evidence to justify that question.

"By the Court: I think it has been brought out without objection.

"By Mr. Fowler: It is an opinion purely based on the witness' experience.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except.

"A. I don't believe you included in the question that it was in contact with the flesh; is that what you meant?

"Q. In contact with the flesh would the recoil have a tendency to pull back the pistol and leave powder burns outside the flesh?

"By Mr. Ellis: We object on the grounds it is incompetent, irrelevant, immaterial and illegal.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except.

"A. Yes, it would tend to.

"Q. What would overcome that tendency in inflicting a wound of this type?

"By Mr. Ellis: We object on the grounds it is incompetent, irrelevant, immaterial and illegal, and not the proper basis for expert testimony.

"By the Court: Overrule the objection.

"By Mr. Ellis: We except.

"A. A definite pressure of the muzzle of the gun against the flesh would overcome that tendency to recoil."

Counsel argues in brief that "It is common knowledge that definite pressure against any substance would be a counter-pressure to recoil, and it is not a matter requiring such technical knowledge as to call for expert testimony." Citing Stallings v. State, 33 Ala.App. 1, 32 So.2d 227; Colvin v. State, 247 Ala. 55, 22 So.2d 548.

It is our conclusion that this was not opinion testimony of an expert on a matter of common knowledge, and that the court's rulings in this respect were proper.

■ It is permissible for an expert to testify that it would not have been possible for a person to have walked after having been shot, Gipson v. State, 262 Ala. 229, 78 So.2d 293, and we do not agree with defendant's contention that this question asked Mr. Brooks: "Based on your observation of the wound on that person I will ask you if it is probable or likely that person could have moved under her own power after having been so shot" called for an unauthorized conclusion of the witness. The witness answered "No."

■ Several witnesses testified to the defendant's good general reputation in the community where he lived and at the place where he worked.

On cross examination these witnesses were asked whether or not they had heard reports of prior particular acts or misconduct on the part of defendant. This was proper. Helms v. State, 254 Ala. 14, 47 So.2d 276; Kervin v. State, 254 Ala. 419, 48 So.2d 204; Johnson v. State, 260 Ala. 276, 69 So.2d 854.

■ Defendant argues that the specific incidents inquired about were too remote in time and place from the offense for which the defendant was on trial to be considered. The questions of which defendant complains pertain to conviction for operating a lottery in Birmingham in 1946; arrest in Chattanooga in May 1948 for operating a lottery; arrest on charge of burglary in Atlanta, in December 1950; arrest in Las Vegas in 1947 on vagrancy charge. No objection was made on the ground of the remoteness in time and place of the incidents inquired about, moreover, the cross examination of character witnesses is largely within the sound discretion of the trial court, subject to review in case of abuse. Snead v. State, 243 Ala. 23, 8 So.2d 269; Johnson v. State, supra. No abuse of discretion affirmatively appears here. Furthermore, the witnesses' negative answer to each question rendered the question harmless. Helms v. State, supra; Johnson v. State, supra.

The question to Mrs. Ella Lee on cross examination as to whether or not she had heard of defendant's arrest in Los Angeles for assault with a deadly weapon on the 2nd day of December, 1957, is obviously a typographical error and not an inquiry with respect to matters occurring after the commission of the offense on trial. The ques-

**332**

tion was, "Had you heard, prior to November 18, 1954, of Homer D. Ellis being arrested," etc.

We find no reversible error in the record and the judgment of the trial court is affirmed.

Affirmed.

#### On Rehearing.

 Our attention is directed to the fact that we omitted one of the grounds of objection interposed to the question asked Mrs. Mildred Ingram: "On that occasion on the telephone call did she talk as though she were intoxicated?" We here add the omitted ground, which is, that the question called for a conclusion of the witness.

It is further requested that we respond to appellant's contention that the court erred in excluding the statement of defendant's witness Eva Kelsoe that on the morning of the day deceased met her death deceased came to Mrs. Kelsoe's home to get listerine and told witness that defendant was then at deceased's apartment.

Appellant insists this evidence was admissible to show good feeling and friendly relationship between deceased and defendant, and was offered to counteract any possible motive by defendant for killing her, and to substantiate defendant's theory that she shot herself accidentally.

Aside from the fact that such evidence was inadmissible because it was hearsay, the court's ruling was not error for the reason that the defendant testified without objection that deceased asked him to take her to Birmingham to look for work and that he went to her apartment that morning and waited while she dressed to go with him. This evidence was undisputed. Hickman v. State, 12 Ala.App. 22, 67 So. 775; Hogue v. State, 38 Ala.App. 131, 78 So.2d 670.

Application overruled.